IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ANGELA L. LAWHON, ADMINISTRATOR
OF THE ESTATE OF JOSHUA L.
LAWHON,

    Plaintiff,

v.                        Case No. 3:19-cv-00924-HEH

JOHN EDWARDS AND LASHAUN
TURNER AND ALEXANDER MAYES AND
CHRISTOPHER TENLEY,

    Defendants.

## **DEFENDANT CHRISTOPHER TENLEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

### **I.**        **INTRODUCTION**

Plaintiff Angela L. Lawhon ("Plaintiff") brings this 42 U.S.C. § 1983 suit as administrator of the estate of Joshua L. Lawhon ("Lawhon"). She alleges Lawhon's constitutional rights under the Fourth and Fourteenth Amendments were violated by Defendants' actions amounting to unreasonable seizure without probable cause and with excessive force. Additionally, Plaintiff brings state claims against all Defendants including survival actions based on false arrest and battery and wrongful death actions based on false arrest and battery.

These claims arise from an alleged incident in which City of Richmond police officers, John Edwards ("Officer Edwards") and Lashaun Turner ("Officer Turner"), responded to a call from Lawhon's roommate, Shaunna Tunstall ("Tunstall"), on January 16, 2018 about physical injuries suffered by Lawhon from falling down, and her belief that he needed to be restrained and treated at a hospital. (ECF Doc. 1, ¶ 16). Tenley and Alexander Mayes ("Mayes"), employees of the Richmond Ambulance Authority ("RAA") were called to assess and/or treat Lawhon.

1

During the incident, Lawhon was taken involuntarily into custody by the Richmond City Officers when Officer Edwards took Lawhon down to the floor.  Tenley and Mayes rendered emergency assistance.  Lawhon became non-responsive.  Lawhon later died on January 20, 2018.

## II.    ALLEGATIONS

The following allegations are derived from Ex. C to the Plaintiff's Complaint:

Officer Edwards made contact with Lawhon who admitted, "Took some drugs I shouldn't have…[inaudible] and didn't help."  (Pl. Ex. C, 4:55:21-5:04:36).  He also yelled, "…I had a bloody nose.  Woman got up and hit me.  I'm not pressing charges."  *Id*.  Tunstall advised no woman hit Lawhon.  *Id*.  Lawhon also admitted, "I kept falling on the floor…on purpose.  *Id*.  At the outset, Officer Edwards began encouraging Lawhon to go to the hospital.  *Id*.   Officer Edwards asked if there were any weapons in the house.  Lawhon answered no, but Tunstall said she didn't know.  *Id*.  Tunstall, who had observed Lawhon prior to the officers' arrival and called them, told Lawhon he was a danger to himself. (Pl. Ex. C, 5:01:47-5:01:48).  Officer Edwards advised Lawhon that he had caused danger to himself, harmed himself, had noticeable injuries, and had admitted to taking some substance, and it would be better if he got checked out at the hospital. (Pl. Ex. C, 5:01:50-5:03:09).  Lawhon responded by stating, "I understand that.  I understand great things.  There's only one.  But I'll take it.  If you give me a drink, I'll take it."  (Pl. Ex. C., 5:03:19-5:03:29).

When Mayes and Tenley arrived, Lawhon started telling them, "I got hit and I blamed it on…[inaudible]."  (Pl. Ex. C, 5:04:44-5:04:49-5:04:52).  Officer Edwards advised Mayes and Tenley that Lawhon had admitted to taking a substance, and Tunstall advised Lawhon had taken a lot of Wellbutrin.  (Pl. Ex. C, 5:05:04-5:05:08).  Officer Edwards and Tunstall explained again why it would be better to go voluntarily than go through the ECO process.  (Pl. Ex. C, 5:05:20-

5:06:04).   Officer Edwards explained Lawhon had admitted to taking substances and had physical injuries. Id. He also explained that if Lawhon refused to go to the hospital, he would have to physically remove him from the residence under a medical ECO because he was a danger to himself or others and he had physical injuries.   (Pl. Ex. C, 5:05:20-5:06:04).   Lawhon asked that the RAA employees be allowed to talk, and Officer Edwards acquiesced.   *Id.*

Mayes asked Lawhon, "What's your name?" to which Lawhon responded with, "Uhhh…" (Pl. Ex. C, 5:06:09-5:06:30).   Lawhon followed with a mumbled statement and then Mayes repeated the question, "What's your name?"   Lawhon did not answer. *Id*. Tunstall told Lawhon to tell them his name. *Id*.   Lawhon looked visibly confused and did not answer.  Mayes advised if he could not answer that question they would need to take him to the hospital.   *Id*. Lawhon finally gave his first name as Josh.   *Id*.   Mayes engaged in a line of questing with Lawhon. (Pl. Ex. C, 5:06:31-5:06:22).  Mayes asked Lawhon where he was, to which he responded, "Shaunna's house." *Id*.   Mayes asked the address, and Lawhon gave a house number and then guessed another number, but Mayes advised the first one was correct. *Id*. Mayes asked Lawhon what month it was and Lawhon responded, "Shit, that's a hard one," but gave the correct answer of January. *Id*. He was asked what year it was and Lawhon answered correctly. *Id*. Mayes asked whether Lawhon took the Wellbutrin in an attempt to harm himself. *Id.* Lawhon denied he did. *Id*. Mayes asked whether Lawhon had any thoughts of harming himself or others. *Id.* Lawhon denied these thoughts, but inexplicably raised his voice when answering no. *Id*. Mayes asked Lawhon not to yell since Mayes was not yelling at him. *Id*. Lawhon advised it was Tourette's and Tunstall stated, "Sometimes he yells, it is incontrollable." *Id*. Mayes twice asked whether Lawhon wanted to go to the hospital, and Lawhon said no and said he "felt normal right now, absolutely normal."   *Id*.   Tunstall encouraged Lawhon to go voluntarily.  (Pl. Ex. C, 5:06:22-

5:06:31). Throughout the interactions, Lawson closed his eyes for long periods of time and blinked slowly.

Mayes commented to the officers that Lawhon did not want to go to the hospital and denied any suicidal ideation or homicidal ideation and asked whether Lawhon admitted such thoughts to them. (Pl. Ex. C, 5:07:27-5:07:38).   In the video, it appears Officer Edwards answered no.  *Id.*

Officer Edwards questioned Tunstall about why she called the police.  (Pl. Ex. C, 5:08:00-5:08:41).  She explained, "He was falling everywhere," and admitted he had calmed down. *Id.* Officer Edwards asked about the substance Lawhon took, and Lawhon explained, "It stops me from going to hell." *Id.*   Mayes advised Officer Edwards that the substance was an anti-depressant. *Id.* Tunstall also advised "it was bad, uncontrollable, the whole house was tore up, like it was clean," and Lawhon "was falling into everything and then screaming." *Id.*  Lawhon interjected, "Hot potato please.  I'm going to push it up once it gets blowing." (Pl. Ex. C, 5:08:42-5:08:47).

Lawhon made a barking noise and stated in an increasing crescendo until yelling "I can't do that with you in here.  I need you all out of this house. You all are bothering me so much.  I'm on a fucking mission to do something to help something."  (Pl. Ex. C, 5:08:50 -5:09:04).  Lawhon stated, "That's all I said to her and that's when she punched me."  (Pl. Ex. C, 5:09:05-5:09:09). Tunstall denied she punched Lawhon.  *Id.*  Lawhon accused a black girl of punching him, and Tunstall advised that she didn't punch him, but rather, he fell on his face on the kitchen table. (Pl. Ex. C, 5:09:09-5:09:19).  Tunstall advised "Wilbur" assaulted another woman "Linda" with a hammer, but it was a totally different scenario than the current one.  (Pl. Ex. C, 5:09:31-5:09:44).

Mayes asked Lawhon to walk around the apartment. (Pl. Ex. C, 5:09:46-5:10:04). Lawhon responded, "This is totally…this is a totally…uh…" and did not finish his sentence. *Id*. Tunstall advised, "I can't be responsible for this." *Id*. Lawhon responded, "This is totally anger." *Id*. Mayes again asked Lawhon to stand up and walk around the apartment. (Pl. Ex. C, 5:10:04-5:10:11). Lawhon's whole body tightened in a short seizure-like episode while he remained sitting. *Id*. Lawhon walked back into the apartment, then turned around and stated, "I don't want to go back here because that's where something happened to me that was bad." (Pl. Ex. C, 5:10:13-5:10:22). Mayes asked Lawhon how many quarters were in a $1.50. Lawhon responded, "7, no 6." (Pl. Ex. C, 5:10:24-5:10:29).

Mayes advised Lawhon that he could not do anything for him if he did not want his assistance, and Lawhon started yelling at Mayes to get out of his house. Meanwhile Mayes advised Tunstall to call them back if his mental state changed. (Pl. Ex. C, 5:10:29-5:15:30). Tunstall objected to Lawhon being left at the apartment based on the way he was behaving and because she "can't take care of that, whatever that mind-thing is…and that mind-thing is uncontrollable." *Id*. Lawhon blamed it on his Tourette's syndrome. *Id*. Tunstall expressed that she would not be responsible if Lawhon ended up dead. *Id*. Mayes advised, "I can't legally touch him unless he wants to go. My hands are kinda tied right now because he [Lawhon mumbled something over Mayes]…I understand he is acting different but …" Officer Edwards made an inaudible comment to Mayes to which Mayes responded, "It's possible." *Id*.

Officer Edwards made another attempt to explain to Lawhon that the RAA employees could not force Lawhon to go the hospital, but he could take him into custody pursuant to a paperless ECO. Lawhon responded by yelling for them to get out of his house. Officer Edwards advised Lawhon that he was acting irrationally. Lawhon advised that he took more medication than he

normally took "to try to make it go away" and then offered to take more medication.   Lawhon thereafter advised he took all he had for that day.   At that point, Mayes and Tenley started putting their gloves on to prepare for an interaction with Lawhon.   Lawhon objected to going to jail, and Officer Edwards, once again, explained that he was not going to jail.   Lawhon continued yelling, telling them to get out of his house and ordering that they leave.   Officer Edwards encouraged Lawhon to turn around at least three times.   When Lawhon refused to cooperate, Officer Edwards offered to allow Lawhon to have a cigarette.   As Lawhon walked past Officer Edwards, Officer Edwards took Lawhon to the floor to get him handcuffed.   Mayes advised Lawhon to relax, and Tenley held Lawhon's legs while Lawhon resisted (Pl. Ex. C, 5:15:31-5:16:17).   Tenley left Lawhon to retrieve a mask, because Lawhon was spitting.  (Pl. Ex. C, 5:16:54-5:16:55).   When Tenley returned, Officer Edwards asked about Lawhon's airway.  (Pl. Ex. C, 5:18:15-5:18:24).   Lawhon started struggling, and Tenley placed his right hand on Lawhon's left shoulder.  (Pl. Ex. C, 5:18:25-5:19:30).   Tenley placed his knee on Lawhon's left shoulder.  (Pl. Ex. C, 5:19:31-5:21:15).   Tenley removed the pillow from under Lawhon's head.  (Pl. Ex. C, 5:21:16-5:22:06).   Tenley turned Lawhon over onto his back and checked his breathing with a stethoscope.  (Pl. Ex. C, 5:22:07-5:22:44).

Tenley left the apartment to go retrieve the stretcher.  (Pl. Ex. C, 5:23:12-5:23:35).   Mayes and Officer Edwards carried Lawhon to the stretcher outside the apartment.  (Pl. Ex. C, 5:24:34-5:25:04).   Tenley performed CPR on Lawhon in the ambulance.  (Pl. Ex. C, 5:28:11-5:29:29).

## III.    LAW AND DISCUSSION

### A.    Standard of Review

The purpose of a motion to dismiss is "to test the legal sufficiency of the complaint." *Randall v. U.S.*, 30 F.3d 518, 523 (4th Cir. 1994).  "To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Twombly*, 550 U.S. at 556. A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where they permit a court to infer no more than a possibility of misconduct. See *Iqbal*, 556 U.S. at 678–79. Thus, where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. at 678. The Court need not accept legal conclusions that are presented as factual allegations, *id*. at 555, or "unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); see also, *Tobey v. Jones*, 706 F.3d 379, 387–88 (4th Cir. 2013).

In this case, Plaintiff attached two exhibits to the Complaint, the body camera footage of Officers Edwards and Turner. The Court can consider video exhibits attached to the complaint without converting the motion to dismiss into a summary judgment motion. See *Butters v. James Madison Univ.*, 145 F. Supp. 3d 610, 617 (W.D. Va. 2015)(citing Fed.R.Civ.P. 10(c)(where the Court considered a sealed video of an alleged assault on a motion to dismiss.)). An exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint. See *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands*,

*LLC,* 713 F.3d 175, 182 (4th Cir.2013). "Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013)(quoting *Brockington v. Boykins,* 637 F.3d 503, 506 (4th Cir.2011) (internal quotation marks omitted)).

**B.**    **Tenley is Not Liable for Unreasonable Seizure Because there Existed Sufficient Probable Cause for the Seizure**

The face of the Complaint and specifically the videos attached as Exhibits C and D reveal that Officer Edwards had sufficient probable cause to take Lawhon into custody; therefore, Tenley was justified in assisting both the officers and Lawhon during the encounter. Furthermore, Tenley himself did not initially take Lawhon into custody and cannot be held liable for the seizure.

Pursuant to Virginia law, a law enforcement officer may take a person into custody to have him assessed for emergency custody pursuant to Va. Code § 37.2-808(G).   Va. Code § 37.2-808(G) provides:

> A law-enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody as stated in this section may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.

Va. Code § 37.2-808 sets forth the criteria for emergency custody:

> [P]robable cause to believe that any person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need

of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Emergency medical providers are not given the statutory authority to take someone into custody against their will and must rely upon law enforcement.  In this case, Tenley and Mayes could not take Lawhon to the hospital involuntarily.  They admitted as much during their interactions. Mayes asked questions to determine whether Lawhon was oriented to person, place and time. Mayes also asked whether Lawhon had any intention of harming himself or others, which Lawhon answered in the negative.  Regardless of the answer to these questions, Mayes and Tenley could not force Lawhon to accept treatment.

Officers Edwards and Turner, on the other hand, had statutory authority to take Lawhon into custody, and they had sufficient probable cause pursuant to Va. Code § 37.2-808.  The information known to the officers at that time, their own observations of Lawhon's behavior, and Tunstall's reports gave rise to probable cause.

Lawhon presented with evidence of self-injuries.  Lawhon admitted he took medicine to "keep from going to hell," and Tunstall advised Lawhon had taken a lot of Wellbutrin.  He made nonsensical and irrational statements like, "I understand great things.  There's only one.  But I'll take it.  If you give me a drink, I'll take it," "Hot potato please.  I'm going to push it up once it gets blowing," "I'm on a fucking mission to do something, to help something," and he refused to walk into a certain part of the apartment because, "that's where something happened to him that was bad." Lawhon claimed he had been punched by a black girl, but Tunstall advised his injuries were the result of his falling on his face into the table.  Tunstall reported that Lawhon kept falling down and that the apartment was clean earlier, but in disarray as a result of Lawhon

falling down[1].  Tunstall objected to any suggestion that Lawhon remain at the apartment because she could not "deal with that mind thing."  Lawhon's responses to even the most basic inquiries like what was his name, were slow and, in the case of his name, required several prompts before he answered.  Lawhon alternated between a calm demeanor and agitated state.  He would speak calmly and then, at other times, raise his voice, even though Mayes and Officer Edwards spoke calmly to him.   Lawhon's speech, slow rate of eye blinking, and failure to keep his eyes open throughout the interactions were that of an intoxicated person.

Officer Edwards gave Lawhon many opportunities to go to the hospital voluntarily. Officer Edwards did not raise his voice, and he treated Lawhon with respect throughout their conversations.  Lawhon still refused.  Rather than give Lawhon an opportunity to get further agitated or prepare for a fight, Officer Edwards plied Lawhon with a cigarette so that as Lawhon walked past him he could take Lawhon to the floor in a swift manner with minimal commotion.

Officer Edwards' decision to take Lawhon into custody was supported by sufficient probable cause as required by Va. Code § 37.2-808 because Lawhon appeared to suffer from mental illness, given his nonsensical and irrational statements and his incorrect belief that his injuries resulted from a black woman hitting him.  Lawhon posed a risk of serious physical harm to himself as evidenced by his self-inflicted injuries and ingestion of Wellbutrin.  He also posed a risk of serious harm due to his lack of capacity to protect himself from harm as evidenced by his falling down, his self-evident injuries, his inability to carry on a rational and coherent conversation, his own admission and that of Tunstull that he ingested too much Wellbutrin, and his offer to take more.  And he was unwilling to voluntarily go to the hospital.  These factors meet the criteria for probable cause pursuant to Va. Code § 37.2-808.

---

[1] Lawhon had earlier admitted he kept falling down on purpose.

The probable cause requirements set forth in Virginia law comport with the federal law governing seizures in a mental health context.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  The Fourth Amendment "impose[s] a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions ...."  *Delaware v. Prouse,* 440 U.S. 648, 653–54, (1979) (internal quotation marks omitted).  "[T]he general right to be free from seizure unless probable cause exists is clearly established in the mental health seizure context."  *Goines v. Valley Cmty. Servs. Bd.* 822 F.3d 159, 169 (4th Cir. 2016) (internal quotations and citations omitted).  "[P]robable cause to seize a person for a psychological evaluation [exists] when the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man to believe that the person poses a danger to himself or others."  *Id.*

Determination as to whether probable cause exists is fact-specific.  Probable cause is not easily defined in the context of seizures for mental health evaluations:

> In order to undertake a mental health seizure, "an officer must have probable cause to believe that the individual posed a danger to [him]self or others." But what exactly counts as probable cause in this context, we have recognized, is less certain: There is a "distinct lack of clarity in the law governing seizures for psychological evaluations, compared with the painstaking definition of probable cause in the criminal arrest context."

*Livingston v. Kehagias*, No. 18-1906, 2020 WL 898092, at *13 (4th Cir. Feb. 25, 2020)

(quoting *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 266 (4th Cir. 1998) and *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015).

In *Cloaninger v. McDevitt*, 555 F.3d 324 (4th Cir. 2009), the Fourth Circuit affirmed officers had probable cause to seize Cloaninger for a mental health evaluation.  The Court found

that the police call for potential suicide, Cloaninger's refusal to communicate with police, the officers' previous knowledge that Cloaninger had a history of attempted suicide, and the officers' belief that Cloaninger had firearms in the house was sufficient probable cause to pursue a mental health seizure.  *Id.* at 332-33.

Here, Officer Edwards had reasonably trustworthy information that Lawhon posed a danger to himself, given both his self-injuries and ingestion of Wellbutrin.  Lawhon's slow response to questions and irrational statements suggested that Lawhon was disconnected from reality, unable to process rational thoughts, or unable to focus his attention.  Furthermore, Officer Edwards spent considerable time with Lawhon during which he could observe and interview Lawhon, he did not detain Lawhon right away, and he acted pursuant to state law authorizing mental health seizures. At bottom, Officer Edwards had probable cause to seize Lawhon under both state and federal authority.

Tenley had no authority to take Lawhon into custody for an ECO.  Tenley had to rely upon the law enforcement officers to make that call.  Once the officers lawfully determined to take Lawhon into custody, Tenley remained at the scene to render aid and assistance to Lawhon. He checked Lawhon's breathing, and heart rate, removed the pillow from under Lawhon's head, transported Lawhon to the ambulance, and provided CPR.

In *Boyd v. Armstrong*, No. CV ELH-17-2849, 2019 WL 1440876 (D. Md. Mar. 29, 2019), Plaintiff alleged medics unlawfully restrained Mr. Boyd and used excessive force when they administered Haldol to Mr. Boyd to help subdue him after officers took him into custody for a mental health evaluation.  Mr. Boyd had earlier called police for an intruder during which a woman could be heard screaming in the background.  When police arrived, Boyd and his fiancée were arguing and Boyd was sweating profusely.  Boyd was acting paranoid, looking around and

claiming people were in the house. Boyd's fiancée reported Boyd had been drinking and smoking marijuana earlier that evening. Boyd tried to get in the police cars. Despite police being on scene, he started running to a neighbor's house screaming, "Help! Call the police!" Boyd began banging on the neighbor's door when the police took him down to the ground. Emergency medical services were summoned, and two medics responded. When the medics arrived, Boyd and the police were struggling. One of the medics administered Haldol to Boyd to help subdue him. The Court determined that the officers' seizure of Mr. Boyd was lawful. The Court also determined that, because the medics did not initially detain Mr. Boyd, any claim for unreasonable seizure against the medics failed. The Court further found that when the medics arrived at the scene:

> They saw a struggle ensuing between the Officers and Mr. Boyd. Based on Armstrong's observations of the way [Mr. Boyd] was acting, Armstrong determined that Mr. Boyd was exhibiting symptoms of [Excited Delirium Syndrome]. As a result, Armstrong decided to sedate [Mr. Boyd] and calm him down, that way he d[idn't] have to be restrained or was no longer fighting. In light of the circumstances, Armstrong's decision to sedate Mr. Boyd was reasonable, and did not amount to the use of excessive force under the Fourth Amendment.

*Id.* at *27 (internal quotations omitted). While the medics in *Boyd* used a chemical restraint, the allegations in this case are similar in nature. Plaintiff alleges Tenley unlawfully restrained Lawhon by helping to subdue Lawhon on the floor of the apartment in a manner that was excessive. As in *Boyd*, Tenley did not initially restrain Lawhon and only provided assistance after Officer Edwards took Lawhon to the floor. Like the medics in *Boyd*, Tenley cannot be held liable for violating Lawhon's constitutional right to be free from unreasonable seizure.

## C.    Tenley is Entitled to Qualified Immunity on Counts I and II

Qualified immunity provides immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, it should be resolved at the earliest possible

stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987) (emphasis added). Indeed, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017). The protection of qualified immunity extends to "all but the plainly incompetent or those who knowingly violate the law." *Raub v. Campbell*, 785 F.3d 876, 880–81 (4th Cir. 2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). The safe harbor of qualified immunity ensures that public employees will not be liable for bad guesses in gray areas, but only for transgressing bright lines. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (emphasis added).

The Supreme Court has outlined a two-pronged test governing qualified immunity. The first prong considers whether the facts, viewed in the light most favorable to the plaintiff, make out a violation of a constitutional right. If they do, the second prong considers whether the constitutional right in question was "clearly established" at the time of the defendants' alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). The Court has discretion to determine which prong to address first. *Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009). A clearly established right is not discussed in a generalized fashion, but instead must be defined at a high level of particularity. *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003). The Supreme Court recently reiterated that "clearly established law must be 'particularized' to the facts of the case . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 137 S. Ct. 548, 552 (2017) (emphasis added).

Recently, the Supreme Court held that,

> [A] court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted. If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—i.e., if a

reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). "[I]n other words, the legal question must be 'beyond debate.'" *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 725 (E.D. Va. 2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

"When addressing qualified immunity in cases involving seizures in the mental health context, the Fourth Circuit has undertaken a fact specific inquiry." *Doe v. Sutton-Wallace*, No. 3:18-CV-00041, 2019 WL 2061969, at *3 (W.D. Va. May 9, 2019)(citing *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 266-68 (4th Cir. 1998)).

In *Livingston*, the officers were dispatched based on calls placed by Cardwell, which the dispatcher described as attempted suicide. When they arrived, the officers found Cardwell agitated, pacing in his driveway in the middle of the night, venting frustrations about the Department of Veterans Affairs, and throwing a beer can toward the back of his truck. The Court declined to determine whether the officers had probable cause. Instead, the Court found they were entitled to qualified immunity because it was not clearly established that the officers lacked probable cause at the time they seized Cardwell. See *Livingston v. Kehagias*, No. 18-1906, 2020 WL 898092, at *13 (4th Cir. Feb. 25, 2020).

In *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 264 (4th Cir. 1998), officers responded to a call for a welfare check based on a husband's call that his wife was suicidal. When officers arrived, they found the wife, Peller, visibly agitated and crying. She told the officers she would commit suicide if it wasn't for her kids and that "she would disappear by the end of the day." The officers concluded Peller was upset, irrational and at risk of hurting herself so they took her into custody for a mental health evaluation. The Fourth Circuit affirmed the district court's finding that the officers were entitled to qualified immunity. *Id.* at 267. It found

that the officers' actions were reasonable, because they "had ample opportunity to observe and interview" Peller, "did not decide to detain [her] in haste," and acted pursuant to state law authorizing mental health seizures. *Id.* at 266-268.

In *Gooden v. Howard Cty., Md.*, 954 F.2d 960, 967 (4th Cir. 1992), officers responded to a call by a neighbor in an apartment complex about screams coming from Ms. Gooden's apartment. Upon arrival, Ms. Gooden denied any noise and said she had been asleep, and the officers observed no signs of physical abuse. The officers were called back for complaints of screams over a week later. On this occasion, the officers heard a "long, loud blood-chilling scream." They heard two more screams come from the apartment, as well as thumping which caused the chandelier in the complaining neighbor's apartment to sway. Upon questioning, Ms. Gooden's answers were evasive. The officers admitted that they observed no signs of injury to Ms. Gooden or others, and that she denied screaming. The officers determined to detain the resident for a mental health evaluation based on their observations and the neighbor's complaints. When a doctor later evaluated the resident, it was determined she did not show signs of mental illness and released her. The Fourth Circuit found that the officers were entitled to qualified immunity:

> Had the officers done nothing—and had Ms. Gooden hurt herself or someone on the premises—the consequences may have been irremediable. **It is a misguided application of § 1983 to expose to liability those who by all objective indicia were only trying to help.** It is further "all too facile [to suggest] that the officers should have walked away from the situation because Gooden evidenced no injuries at the time they were with her. If the officers had refused to act until they saw blood, bruises and splintered furniture, it might have been too late for Gooden or her neighbors.

*Gooden v. Howard Cty., Md.*, 954 F.2d 960, 967 (4th Cir. 1992)(quotation omitted)(emphasis added). The Court also pointed out that it was reasonable for the officers to consider the neighbor's complaint in making their determination to detain Ms. Gooden:

> The officers can hardly be faulted for attaching credence to such citizen complaints. As the Seventh Circuit has noted, the police cannot invariably be held under § 1983 as guarantors of every such report. Rather, "[i]f policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded.

*Gooden v. Howard Cty., Md.*, 954 F.2d 960, 966 (4th Cir. 1992)(quoting *McKinney. George,* 726 F.2d 1183, 1187 (7th Cir. 1984)).

## D.     Tenley is Entitled to Qualified Immunity on Plaintiff's Unreasonable Seizure Claim

Should the Court determine probable cause insufficient to support Lawhon's seizure by officers, or decline to answer that question, Tenley is still entitled to qualified immunity, because it was not clearly established that Tenley would be violating Lawhon's constitutional rights to be free from seizure initiated by law enforcement officers.

Here, unlike Cloaninger, Cardwell, Peller, Gooden, and Boyd, Lawhon showed obvious signs of physical injury upon arrival by police and medics.  Like Cardwell and Boyd, Lawhon was under the influence of a drug[2] and his roommate said he ingested a lot.   Like Peller and Cardwell, Lawhon became visibly agitated during his interactions with police and the RAA paramedics.  Similar to Gooden, Lawhon's statements were strange and irrational.   Officers were faced with a situation which suggested self-harm as evidenced by his injuries and his decision to take too much medication.  Unlike Gooden, the officers ***were*** faced with blood and an apartment in disarray, reported by Tunstall to be a result of Lawhon's behavior.  Even if the officers did not have probable cause in this case, they are entitled to qualified immunity because it was not clearly established in these circumstances that probable cause was insufficient.

---

[2] Cardwell was drinking alcohol, and Boyd had been drinking and smoking marijuana.

Under these circumstances, a reasonable paramedic encountering Lawhon would have reasonably relied upon law enforcement's determination that Lawhon needed to be taken into custody against his will.  Lawhon showed signs of injury, reported by the roommate as self-inflicted.  Lawhon admitted to be under the influence of "a lot" of Wellbutrin, as Tunstall confirmed.  Lawhon's roommate was fearful of Lawhon's mental state.  Lawhon could not keep his eyes open on multiple occasions throughout his interactions with the police and EMT officers. Lawhon could not answer basic questions easily and made irrational statements. Lawhon would become alternately agitated and calm, and Lawhon would not voluntarily go to the hospital after being told multiple times that if he did not, an ECO would be inevitable.

If the officers are entitled to qualified immunity for taking Lawhon into custody in a situation where it was not clearly established that Lawhon's rights were violated, so too must Tenley be entitled to qualified immunity for any role he played in dealing with Lawhon and assisting the officers at the scene.

**E.**   **Tenley is Entitled to Qualified Immunity on Count II:  Unreasonable Seizure by Excessive Force**

Whether officers used excessive force in an investigatory stop or other seizure of a person is analyzed under the Fourth Amendment "objective reasonableness" standard.  *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) *cert. denied sub nom.*, *Vill. of Pinehurst, N.C. v. Estate of Armstrong*, 137 S.Ct. 61 (2016) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  Objective reasonableness is judged in light of the facts and circumstances confronting the officers, without regard to the officers' underlying intent or motivation.  *Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) (alterations in original) (quoting *Graham*, 490 U.S. at 397).  The Fourth Circuit in *Armstrong* considered three factors to determine whether the use of force was reasonable: (1) " 'the severity of the crime at issue;' " (2)

18

"the extent to which 'the suspect poses an immediate threat to the safety of the officers or others;' " and (3) " 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.' " *Armstrong*, 810 F.3d at 899 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court found that some force is justified to keep someone from hurting themselves and others.  It there is resistance, seizure may be appropriate[3].  *Id*. at 901.  Officers are allowed to take someone into custody using force, including force necessary to get them handcuffed when they struggle.

Here, Officer Edwards tried to convince Lawhon to go to the hospital voluntarily multiple times.  Officer Edwards explained to Lawhon what would happen if he had to take him into custody pursuant to ECO, instead of going with Mayes and Tenley.  He explained why he would have to take him against his will to include his ingestion of substances, his self-injury, and his risk of harm.  Even after Mayes explained to Lawhon, the officers on scene, and Tunstall that they could not force Lawhon to go, Tunstall objected and the situation continued to evolve. Lawhon continued to refuse to go to the hospital voluntarily, began to escalate, admitted to taking "more medication," raised his voice, and made irrational statements.  When it became clear that all efforts to get Lawhon to go to the hospital voluntarily were unsuccessful, Officer Edwards asked Lawhon three times to turn around so he could handcuff him.  When Lawhon refused, Officer Edwards used Lawhon's desire for a cigarette as a means to get Lawhon to walk by him and take him down.  No weapons were used by either the officers or by Tenley and Mayes to subdue Lawhon.  Officer Edwards worked to get Lawhon handcuffed, and Tenley held Lawhon's legs while Lawhon resisted.  After Tenley returned from retrieving a mask, Tenley placed his right hand on Lawhon's left shoulder.  Later, Tenley placed his knee on Lawhon's left

---

[3] In *Armstrong*, the Court found the officers were not entitled to qualified immunity for their use of the taser on Armstrong, but they did find the officers' other use of force appropriate.

shoulder.    Tenley improved Lawhon's airway by removing the pillow from under Lawhon's head and provided emergency care when Lawhon became unresponsive.

None of these actions amounted to excessive force.  Officer Edwards worked hard to get Lawhon to go to the hospital voluntarily, without success. When Officer Edwards took Lawhon to the ground, Tenley's participation amounted to holding Lawhon's legs and later his shoulder area while Lawhon struggled.  During this time, Tenley was also providing medical assistance. The officers used a reasonable amount of force to take Lawhon into custody, after making efforts to gain his cooperation.

Even if Tenley's conduct violated Lawhon's rights, it was not clearly established that it did so.  Tenley, as an emergency medical services provider assisting law enforcement to subdue a person whom law enforcement had determined should be taken into custody and providing medical assistance to the subdued person as necessary, could not have known that his conduct was improper.  For these reasons, Tenley should be entitled to qualified immunity on the excessive force claim.

## F.    Plaintiff's Survival Claims Must be Amended into Wrongful Death Claims Where Lawhon Died of his Injuries

Virginia's survival statute allows causes of action to survive upon the death of the person against whom the claims can be made, or the death of person "in whose favor the cause of action existed."  Va. Code § 8.01-25.  "Code § 8.01–25 only applies to causes of action "exist[ing]" prior to the decedent's death and provides that a "cause of action asserted by the decedent in his lifetime" for personal injury does not "survive," but rather can be amended as a wrongful death action under Code § 8.01–56."  *Campbell v. Harmon*, 271 Va. 590, 598–99, 628 S.E.2d 308, 312 (2006) (citing *Hendrix v. Daugherty*, 249 Va. 540, 542, 457 S.E.2d 71, 73 (1995)); see also Va. Code § 8.01–56, which provides that when the action is amended to a wrongful death action,

there is, "but one recovery for the same injury."  The Fourth Circuit agreed with the district court's ruling that, "§ 8.01-25 defers to the wrongful death statute as the exclusive statement of the grievances that Virginia will recognize when a tort victim dies of her injuries."  *El-Meswari v. Wash. Gas Light Co.*, 785 F.2d 483, 491 (4th Cir. 1986) (where a five year old died of injuries eight days after she was hit with roofing materials discarded from a roof during a construction project).

Here, Plaintiff makes both survival claims and wrongful death claims.  Because Lawhon died of his injuries, Plaintiff's wrongful death claim is the Plaintiff's only state law claim, whether it arises from alleged false arrest or battery.   Plaintiff's allegations regarding Lawhon's alleged "pre-death injuries" (ECF Doc. 1, ¶¶ 65, 75) do not change the analysis.  Plaintiff's survival claims should be dismissed with prejudice.

**G.**   **Plaintiff's Claim for  False Arrest Cannot Succeed Where Probable Cause Existed**

To succeed on her state law claim of false arrest, Plaintiff must establish that Tenley restrained Lawhon's liberty without any sufficient legal excuse.  *Lewis v. Kei*, 281 Va. 715, 724, 708 S.E.2d 884, 890 (2011); see also *Jordan v. Shands*, 255 Va. 492, 497, 500 S.E.2d 215 (1998). The Supreme Court of Virginia has explained that "false imprisonment is a wrong akin to the wrongs of assault and battery, and consists in imposing by force or threats an unlawful restraint upon a man's freedom of locomotion." *Jordan*, 255 Va. at 497.  In Virginia, false arrest and false imprisonment are synonymous. *Cole v. Eckerd*, 54 Va. Cir. 269, 2000 WL 33595085 * 2 (Va. Cir. Ct. 2000) (citation omitted).  A lawful arrest does not give rise to a claim for false arrest and/or false imprisonment.  See *Lewis*, 281 Va. at 724.

As set forth *supra.*, Tenley did not seize Lawhon.  Even so, a law enforcement officer, not an emergency services provider, may take a person into custody to have him assessed for

emergency custody pursuant to Va. Code § 37.2-808(G).   To the extent that the law applicable to arrest warrants also applies to emergency custody orders, the existence of probable cause to obtain an ECO negates a claim for false arrest.  See *Lewis*, 281 at 729.  As stated *supra*., Officer Edwards had sufficient probable cause to seize Lawhon; therefore, any assistance provided by Tenley was also lawful.  Furthermore, if the Court determines that Tenley's actions were reasonable as a matter of law under § 1983, his actions cannot be wrongful under state law, and the state law claims should be dismissed.  See *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998); see also *Milstead v. Kibler*, 91 F. Supp. 2d 895, 901 (W.D. VA 2000), aff'd, 243 F.3d 157 (4th Cir. 2001) (abrogated on other grounds).  For these reasons, Plaintiff's false arrest claim against Tenley should be dismissed with prejudice.

**H.**     **Plaintiff's Claim of Battery Cannot Succeed Where Tenley's Actions Were Justified**

"The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett,* 265 Va. 12, 16, 574 S.E.2d 258 (2003) (citations omitted).  Legal justification existed for Tenley's touching of Lawhon based on Officer Edwards' decision to take Lawhon into custody.  Officer Edwards made the decision to seize Lawhon with sufficient probable cause. Once Officer Edwards made that decision, Tenley's limited use of force was justified to help bring Lawhon under control and provide emergency assistance.

**I.**     **Tenley is Protected by Sovereign Immunity**

Statutory sovereign immunity protects emergency medical services from tort liability.

Virginia Code § 32.1-111.4:3 provides:

A. Any county, city, or town may provide emergency medical services to its citizens by (i) establishing an emergency medical services agency as a department of government pursuant to § 32.1-111.4:6 or (ii) contracting with or providing for the provision of emergency medical services by an emergency medical services agency established pursuant to § 32.1-111.4:7.

B. In cases in which a county, city, or town elects to contract with or provide for emergency medical services by an emergency medical services agency pursuant to clause (ii) of subsection A, **the emergency medical services agency shall be deemed to be an instrumentality of the county, city, or town and, as such, exempt from suit for damages done incident to the provision of emergency medical services** therein unless the emergency medical services agency is a private, for-profit emergency medical services agency.

(emphasis added). The RAA, as an emergency medical services provider established pursuant to § 32.1-111.4 by ordinance of the City of Richmond, is an instrumentality of the City of Richmond and is exempt from suit for damages incident to the provision of emergency medical services. The statute creating the immunity does not carve out an exception for intentional torts. Even so, a municipality is immune from liability for the intentional torts of its employees. See *Niese v. City of Alexandria*, 264 Va. 230, 239, 564 S.E.2d 127, 132 (2002)(sovereign immunity extends to liability for acts of gross negligence and intentional torts on the part of the city's employees). RAA can only act through its employees, "[G]overnment can function only through its servants, and certain of those servants must enjoy the same immunity in the performance of their discretionary duties as the government enjoys." *Messina v. Burden*, 228 Va. 301, 309 (1984) (citations omitted). If an individual works for an immune governmental entity then, in a proper case, that individual will be eligible for the same protection. *Messina v. Burden*, 228 Va. 301, 312-313 (1984).

Whether an employee like Tenley derives sovereign immunity from the RAA depends upon the four part test set forth in *James v. Jane*, 221 Va. 43 (1980):

1. The nature of the function performed by the employee;

2. The extent of the immune entity's interest and involvement in the function;

3. The degree of the immune entity's control and direction over the work of the employee; and

23

4.      Whether the act complained of involved judgment or
        discretion by the employee.

*Messina*, 228 Va. at 313, citing *James v. Jane*, 221 Va. 43 (1980); *Stanfield v. Peregoy*, 245 Va. 339 (1993); see also *National Railroad Passenger Corp. v. Catlett Volunteer Fire Co.*, 241 Va. 402 (1991).  As set forth below, Tenley is entitled to qualified immunity based on these factors:

The Supreme Court of Virginia has held that the provision of ambulance services and medical care is a governmental function.  *Edwards v. City of Portsmouth*, 237 Va. 167, 169-70, 375 S.E.2d 747, 749 (1989).  Tenley satisfies the second element of the test, because the RAA has an identifiable and undeniable interest in the overall provision of emergency services to people living in the City of Richmond.  *Messina*, 228 Va. at 314 (finding that county had clear interest in activities of the Chief of the Operations Division of the Department of Public Works); *Colby v. Boyden*, 241 Va. 125, 129 (1991) (finding that a municipality is inextricably involved in the enforcement of traffic laws through financial, personnel, and policy initiatives).  Third, by exercising administrative control and direction over its employees, the RAA demonstrates sufficient interest and control over their work to satisfy the third prong of the test.  *Messina*, 228 Va. at 310-11; *Bowers v. Comm. Dept. of Highway Transportation*, 225 Va. 245, 253 (1983) (holding that an engineer that is a subordinate employee of VDOT satisfies control and direction test); *Colby v. Boyden*, 241 Va. 125 (1991) (holding that test is satisfied where City exercised administrative control and supervision of police officer's activities).

Finally, Tenley is entitled to immunity, because the act of assessing and treating Lawhon at his home with obvious signs of physical trauma, reports that Lawhon had ingested Wellbutrin, obvious signs that Lawhon was experiencing difficulty both physically and mentally in his interactions with both the police officers and the RAA personnel on scene, observing the situation evolve as Lawhon alternated between a calm demeanor and agitated state, and

24

providing emergency medical care deemed necessary on scene necessarily required the exercise of judgment and discretion. *National Railroad Passenger Corp. v. Catlett Volunteer Fire Co.*, 241 Va. 402 (1991) (finding that the operation of a fire truck in response to an emergency involves the exercise of judgment and discretion); *Colby v. Boyden*, 241 Va. 125 (1991) (finding that officers must make difficult judgments about the best means to effectuate a government purpose by embracing special risks); *Parker v. McCoy*, 212 Va. 808, 813 (1972); see also *Fox v. Custis*, 236 Va. 69 (1988) (finding that officers had discretion in determining whether to make arrest).

Having met all the factors set forth in *James v. Jane*, Tenley, an employee of the RAA and acting within the course of his employment at the time of the alleged incident, enjoys immunity, derived from RAA's statutory immunity, from any state claims made against him.

**J.     Christopher Tenley is immune from civil liability pursuant to the "Good Samaritan" statute of Virginia Code § 8.01-225.**

Pursuant to Virginia Code § 8.01-225(a)(5), also known as the "Good Samaritan" statute, any person who:

> [i]s an emergency medical services provider possessing a valid certificate issued by authority of the State Board of Health who in good faith renders emergency care or assistance, whether in person or by telephone or other means of communication, without compensation, to any injured or ill person, whether at the scene of an accident, fire, or any other place, or while transporting such injured or ill person to, from, or between any hospital, medical facility, medical clinic, doctor's office, or other similar or related medical facility, ***shall not be liable for any civil damages for acts or omissions resulting from the rendering of such emergency care, treatment, or assistance***, including but in no way limited to acts or omissions which involve violations of State Department of Health regulations or any other state regulations in the rendering of such emergency care or assistance.[4]

---

[4] Importantly, "compensation" shall not be construed to include the salaries of police, fire, or other public officials or personnel who render such emergency assistance. VA. CODE § 8.01-225(E)(i). As such, Tenley is not compensated pursuant to § 8.01-225(E)(i).

(emphasis added). "Virginia law provides absolute immunity to certified emergency medical technicians from civil damages arising out of emergency care or assistance they have administered." *Bowen v. Scott County Lifesaving & First Aid Crew, Inc.*, 43 Va. Cir. 28, *1 (Wise Co. 1997) (finding that the individual emergency medical technicians would be immune from liability for any civil damages stemming from the alleged improper transportation of the decedent, including damages flowing out of actions based on gross negligence or willful and wanton conduct, as long as they acted in good faith in providing the emergency medical care)[5]; See, e.g., Penn v. Manns, 221 Va. 88, 92, 267 S.E.2d 126, 129 (1980) (finding that a defendant who drove a gun-shot wound victim to the hospital at a high rate of speed, jumped a curb, and collided with a concrete pillar, which ultimately cause the victim's death, provided emergency medical care in "good faith" under the Good Samaritan statute). *see also Harrison v. Prince William County Police Dept.*, 640 F. Supp. 2d 688, 713 (E.D. Va. Feb. 10, 2009) (stating that the Virginia's Good Samaritan statute protects those that, in good faith, render emergency medical care or assistance to others).

Tenley, as a medical services provider pursuant to Virginia Code § 32.1-111.1, rendered emergency assistance to law enforcement officers and to Lawhon in good faith on January 16, 2018.[6] BLACK'S LAW defines "good faith," in part, as "….the state of mind denoting honesty of purpose, freedom from intention to defraud, and generally speaking, means being faithful to

---

[5] This case was decided under the previous version of § 8.01-225 which applied to "emergency medical technicians." The current version of the statute was changed in 2015 and applies to an "emergency medical services provider," which is broader than the previous version.

[6] "Emergency medical services provider" means any person who holds a valid certificate as an emergency medical services provider issued by the Commissioner pursuant Virginia Code § 32.1-111.1. Here, Plaintiff alleges Tenley is a paramedic, and as such, qualifies as an emergency medical services provider.

one's duty or obligation."[7] Here, Tenley acted in good faith in providing emergency medical services to Lawhon.

Upon Tenley's arrival at the residence, Lawhon had blood on his face and shirt. Mayes then asked Lawhon a series of questions. Tenley and Mayes soon learned that Lawhon consumed a large amount of Wellbutrin, an antidepressant medication. Further during the encounter, Lawhon demonstrated a pattern of slurred speech, delayed responses, erratic outbursts, and irrational statements.

Officer Edwards determined Lawhon should be taken into custody pursuant to an ECO. Edwards began the initial takedown.  Lawhon physically resisted the officers.  Tenley stayed at the scene and rendered assistance by restraining Lawhon's legs and then retrieving a mask. Tenley checked the decedent's airway and breathing, he removed the pillow from Lawhon's face, and he checked his heart with his stethoscope. When Lawhon did not appear to be respirating normally, Tenley helped transport Lawhon to the emergency vehicle. While in the ambulance, Tenley treated Lawhon and began conducting CPR.

Ultimately, Tenley acted in good faith in rendering emergency care and assistance. Had Tenley not stayed at the scene to help the officers and Lawhon, the officers would have had no immediate access to emergency equipment or expertise, once they commenced the takedown. The language of Virginia Code § 8.01-225(a)(5) does not limit immunity to certain causes of action.  Rather, it provides absolute immunity to *any* claim for civil damages.  Regardless of how Plaintiff seeks to posture her case against Tenley, he is immune from civil liability in connection with Plaintiff's claims of false arrest and battery.  Tenley's good faith efforts to help Lawhon should not be rewarded with a lawsuit.

---

[7] Case law in Virginia is scare, if not non-existent, on what constitutes "good faith" under Virginia Code § 8.01-225.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Christopher Tenley, by counsel, respectfully requests that this Court grant his Motion to Dismiss and enter an Order dismissing all claims against him, with prejudice.

CHRISTOPHER TENLEY

By Counsel

/s/_____
David P. Corrigan (VSB No. 26341)
Leslie A. Winneberger (VSB No. 45040)
Counsel for Christopher Tenley
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
lwinneberger@hccw.com

# **C E R T I F I C A T E**

I hereby certify that on the 11th day of March, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

>Jonathan E. Halperin, Esq. (VSB No. 32698)
>Isaac A. McBeth, Esq. (VSB No. 82400)
>Halperin Law Center, LLC
>5225 Hickory Park Drive, Suite B
>Glen Allen, VA 23060
>804-527-0100 - Phone
>866-335-1502 - Fax
>jonathan@halperinlegal.com
>isaac@halperinlegal.com

>/s/ _____
>David P. Corrigan (VSB No. 26341)
>Leslie A. Winneberger (VSB No. 45040)
>Counsel for Christopher Tenley
>Harman, Claytor, Corrigan & Wellman
>P.O. Box 70280
>Richmond, Virginia  23255
>804-747-5200 - Phone
>804-747-6085 - Fax
>dcorrigan@hccw.com
>lwinneberger@hccw.com