**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

ANGELA L. LAWHON,                         )
ADMINISTRATOR of the                      )
ESTATE of JOSHUA L. LAWHON                )
                                          )
      **Plaintiff,**                      )
                                          )
v.                                        )      **Case No.  3:19-cv-924-HEH**
                                          )
JOHN EDWARDS, et al.                      )
                                          )
      **Defendants.**                     )

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS (QUALIFIED IMMUNITY)

Plaintiff Angela Lawhon ("Ms. Lawhon"), by counsel, respectfully submits the following Memorandum in Opposition to Motion to Dismiss (Qualified Immunity) (the "Motion") filed by Defendants John Edwards ("Officer Edwards") and Lashaun Turner ("Officer Turner") (collectively, "Defendants").

### STATEMENT OF FACTS

Defendants were, at all times relevant to this case, officers employed by the City of Richmond Police Department ("RPD").  Compl. ¶¶ 5-6.  Prior to the evening at issue, Defendants had been specifically trained by RPD on the risks of positional asphyxia and the other content articulated in the 1995 DOJ Pamphlet addressing that subject (appended to the Complaint as Exhibit A) and RPD General Order 6-10 (appended to the Complaint as Exhibit B). Id. ¶¶ 13-14.  Those materials make clear that the use of the prone restraint technique on a suspect whose arms have been handcuffed behind him or her can cause the suspect to experience asphyxiation and death.  Ex. A at 1-2; Ex. B at 8.  The DOJ Pamphlet also makes clear that the use of pressure on a suspect's back who has been restrained in the prone position can further

compound the asphyxiation risks associated with use of the prone restraint position.  Ex. A at 1-2.  According to those publications, officers are <u>required</u> to shift a suspect out of the prone position "<u>immediately</u>" after a suspect has been handcuffed (Exhibit A) or "as soon as possible" after the suspect has been handcuffed (Exhibit B) to "minimize the <u>potential</u> for in-custody injury or <u>death</u>."  <u>Id.</u> at 2 (emphasis added); Ex. B at 9 (emphasis added).

On the evening of January 16, 2018, Shaunna Tunstall ("Ms. Tunstall") called 911 in an attempt to secure medical care for her roommate, Joshua Lawhon ("Mr. Lawhon").  Compl. ¶ 15.  She reported to the dispatcher that Mr. Lawhon had fallen down and hit his nose, and was bleeding as a result.  <u>Id.</u> ¶ 16.  She further reported that she did not know if Mr. Lawhon had consumed any drugs or alcohol, but that she believed that he needed to be restrained and go to the hospital.  <u>Id.</u>  In response to Ms. Tunstall's 911 phone call, Defendants were dispatched to Ms. Tunstall's and Mr. Lawhon's residence—3615 Stockton Street in Richmond, Virginia (the "Premises").  <u>Id.</u> ¶ 17.

When Defendants arrived at the Premises, Ms. Tunstall advised Officer Edwards and Officer Turner that Mr. Lawhon had been "falling around" and hit his head on a table.  Officer Edwards' Bodycam Footage, Ex. C at 00:41-00:50.  Defendants then encountered Mr. Lawhon inside the Premises.  <u>Id.</u> at 01:55.  At that time, Mr. Lawhon had blood on his face and shirt from a nosebleed.  Compl. ¶ 19.  Nevertheless, his disposition was completely calm.  Ex. C at 01:56-02:08.  Officer Edwards asked what had happened and Mr. Lawhon stated that he "took some drugs that I shouldn't have that sent me to the pit of hell."  <u>Id.</u>  Officer Edwards advised Mr. Lawhon that they would take him to the hospital, but Mr. Lawhon refused the offer twice.  <u>Id.</u> at 02:08-02:27.  Officer Edwards advised Mr. Lawhon that Officer Edwards was going to take Mr. Lawhon into custody pursuant to an emergency custody order ("ECO") unless Mr. Lawhon would voluntarily go to the hospital.  <u>Id.</u> at 2:14-2:17.  In response, Mr. Lawhon explained to

Officer Edwards that he had a bloody nose because another woman living at the Premises hit him in the face.  Id. at 02:30-02:38.[1]  This explanation prompted Officer Edwards to seek further clarification from Ms. Tunstall as to her reasons for calling 911:

> OFFICER EDWARDS:  Okay.  So what -- okay.  So he was just falling around and stuff?
>
> MS. TUNSTALL:  Yeah, kicking and screaming.

Id. at 02:51-02:57.

Officer Edwards proceeded to tell Mr. Lawhon that he wanted to have EMS personnel evaluate Mr. Lawhon.  Id. at 03:16-03:23.  Mr. Lawhon again responded that he was fine.  Id. at 03:52.  Mr. Lawhon then asked Officer Turner twice if he could have a cigarette, and Officer Turner refused.  Id. at 04:00-04:06.  Mr. Lawhon explained to Officer Edwards that the drug he had taken was a prescription medication called "Wellbutrin."  Id. at 04:28-04:39.  Officer Edwards then asked Mr. Lawhon and Ms. Tunstall if there were any weapons in the Premises, and both of them responded "no."  Id. at 04:44-04:48.  After several minutes of speaking with Defendants, Mr. Lawhon told them, "You all can just leave, please. . . There's no reason for me to go to the hospital."  Id. at 08:01-08:09.

Three minutes later, EMS personnel ("EMS Mayes" and "EMS Tenley") arrived at the Premises and Mr. Lawhon explained that he had been hit and had a bloody nose, but did not need to go to the hospital.  Id. at 11:10-11:15.  The following dialogue then occurred:

> OFFICER EDWARDS:  He admitted to taking some sort of --
>
> MS. TUNSTALL:  Wellbutrin.

---

[1]    Ms. Tunstall initially questioned whether someone had struck Mr. Lawhon, demonstrating she did not have personal knowledge whether the event had occurred or not.  Ex. C at 02:36-02:38.  She would later confirm after the incident that she did not know the cause of Mr. Lawhon's nosebleed.  Id. at 37:59-38:02.  Yet, as the encounter continued to unfold and Mr. Lawhon continued to insist that someone had struck him, Ms. Tunstall insisted that no one had struck him.  Compare Id. at 03:07; id. at 15:28-15:38, with id. at 03:09; id. at 15:35.

> OFFICER EDWARDS:  -- medicine.
>
> MS. TUNSTALL:  A lot of Wellbutrin.
>
> OFFICER EDWARDS:  The injury is to his area -- it was self-induced, per witness.  I told him that we needed to have an ambulance staff to come take a look at him.
>
> EMS MAYES:  Sure.

Id. at 11:25-11:40.

EMS personnel then began to question Mr. Lawhon to determine whether he needed to be

hospitalized:

> EMS MAYES:  What's your name?
>
> MS. TUNSTALL:  Tell them your name.
>
> EMS MAYES:  If you can't answer that question, I have to take you to the hospital.
>
> MR. LAWHON:  Josh.  I'm sorry.  Josh.
>
> OFFICER EDWARDS:  Right.
>
> EMS MAYES:  Where are we right now, Josh?
>
> MR. LAWHON:  We're in Shaunna's house.
>
> EMS MAYES:  Okay.  What's the address here.
>
> MR. LAWHON:  It's about 3615.
>
> EMS MAYES:  Okay.
>
> MR. LAWHON:  Or, 3516.
>
> EMS MAYES:  You were right the first time.
>
> MR. LAWHON:  Okay.  Cool.
>
> EMS MAYES:  What month are we --
>
> MR. LAWHON:  I'm not messed up.
>
> EMS MAYES:  What month are we in?
>
> MR. LAWHON:  Shit, that's a hard one.  January.
>
> EMS MAYES:  Cool.  What year is it?
>
> MR. LAWHON:  2018

EMS MAYES:  Did you take the Wellbutrin in an attempt to harm yourself tonight?

MR. LAWHON:  No.

EMS MAYES:  Okay.  Have you had any thoughts of wanting to harm yourself or others.

MR. LAWHON:  (Yelling) No.

EMS MAYES:  Okay

MR. LAWHON:  Sorry.

EMS MAYES:  No need to yell.  I'm not yelling at you.

MR. LAWHON:  I know.

MS. TUNSTALL:  But sometimes he yells.  I mean, it's uncontrollable.

MR. LAWHON:  It's Tourette's.

EMS MAYES:  You have Tourette's.

MR. LAWHON:  I have it due to anxiety.

EMS MAYES:  Okay.  Alright.  Do you want to go to the hospital with me?

MR. LAWHON:  This is -- I feel normal right now.

EMS MAYES:  I understand.

MR. LAWHON:  Absolutely normal.

EMS MAYES:  Do you want to go to the hospital?

MR. LAWHON:  No.

Id. at 12:30-13:43.

EMS personnel then directed their questioning to Defendants:

EMS MAYES:  He said he didn't want to go, and denied SI/HI.  Did he admit SI or HI to you all?  That he took it in an attempt to harm himself at all?

OFFICER TURNER:  No.

\* \* \*

5

> MR. LAWHON:  My insurance won't even take another time in the hospital.  They'll kick me out.  They wouldn't accept me.  I know that for sure.
>
> OFFICER EDWARDS:  Who actually -- you called?
>
> MS. TUNSTALL:  I called.
>
> OFFICER EDWARDS:  You called out of concern?
>
> MS. TUNSTALL:  Yeah.
>
> OFFICER EDWARDS:  Okay.
>
> MR. LAWHON:  I was just falling around --
>
> MS. TUNSTALL:  He was falling everywhere.
>
> OFFICER EDWARDS:  Has he calmed down now that we've --
>
> MR. LAWHON:  I'm fine.
>
> OFFICER EDWARDS: -- been here?
>
> MS. TUNSTALL:  Yeah

Id. at 13:50-14:00, 14:14-14:31.

At this point during Defendants' interaction with Mr. Lawhon, Mr. Lawhon appeared to hallucinate that someone else was in the room and spoke briefly to that person.  Id. at 15:02-15:28.[2]  Those statements prompted additional evaluation by EMS Mayes of Mr. Lawhon's ability to care for himself and of Mr. Lawhon's mental status:

> EMS MAYES:  Sir, just to make sure you can take care of yourself -- can you stand up for me and show me that you can walk around without falling over?
>
> * * *
>
> MR. LAWHON:  Yeah.
>
> EMS MAYES:  Cool.  Go ahead and do so.
>
> MR. LAWHON:  Okay. (walks around room)
>
> EMS MAYES:  Thank you.

---

[2]     This was most likely a manifestation of Mr. Lawhon's schizophrenia.  Compl. ¶ 15.

MR. LAWHON:   I don't want to go back here (gesturing at bedroom), because that's where something just happened to me that was really bad.

EMS MAYES: Okay.  Alright.  How many quarters are in $1.50?

MR. LAWHON:  Seven.  No six.

EMS MAYES:  Okay.

OFFICER EDWARDS:  Damn, that's smart.  Took me a minute.  I don't know.

MR. LAWHON:  I can't believe it.

Id. at 16:08-16:14; 16:34-16:54.

EMS Mayes then attempted to explain to Ms. Tunstall that his evaluation led him to conclude that he could not take Mr. Lawhon to a hospital against his will, and told her to call them back if his mental status changed or if he became depressed.  Id. at 17:00-17:08.  Ms. Tunstall insisted that EMS Mayes take Mr. Lawhon with him, to which EMS Mayes responded "if we take him . . . it's called kidnapping."  Id. at 17:08-17:23.  After doing so, EMS Mayes turned to Officer Edwards and stated, "I mean he's in control and refused everything from me.  I mean, I can't legally touch him unless he wants to go.  My hands are kinda tied right now.  I understand he's acting different, but…"  Id. at 17:54-18:06.  Nevertheless, Officer Edwards decided to press forward with taking Mr. Lawhon into custody, even though Mr. Lawhon continued to deny any need for medical care and begged Officer Edwards to leave his home.  Id. at 18:20-20:45.  Officer Edwards ordered Mr. Lawhon to turn around five times, but Mr. Lawhon refused.  Id. at 20:46-21:19.  Having seen that Mr. Lawhon would not voluntarily leave his home, Officer Edwards initiated a ruse in which he baited Mr. Lawhon to go to his room to get a cigarette so that he could catch Mr. Lawhon by surprise and force him down to the ground.  Id. at 21:26-21:52.

As Mr. Lawhon headed toward his room, Officer Edwards grabbed Mr. Lawhon and

threw him to the ground.  Id. at 21:53-21:59.  Approximately thirty-seven seconds after making the initial physical contact with Mr. Lawhon, Officer Edwards had successfully placed Mr. Lawhon in the prone position, pulled Mr. Lawhon's arms behind his back, and secured both of Mr. Lawhon's arms with handcuffs.  Id. at 22:36.  Yet, Defendants did not shift Mr. Lawhon out of the prone position as required by their training and General Order 6-10.  Rather, they continued to hold Mr. Lawhon in the prone position for just under six minutes.  Id. at 22:36-28:31.  During that time, Defendants and EMS personnel applied varying degrees of pressure and weight to Mr. Lawhon's back and extremities using their hands and knees.  Id.  This application of force, in turn, compounded the breathing difficulties Mr. Lawhon was experiencing by being restrained in the prone position with his arms handcuffed behind him.  Id.  Defendants' application of pressure and weight on Mr. Lawhon's back also forced Mr. Lawhon's face into a pillow for just under five minutes, further impairing Mr. Lawhon's ability to breathe.  Id. at 22:36-27:31.

This utterly unnecessary use of force persisted despite Mr. Lawhon screaming "I can't breathe!" and "You're killing me!"  Id. at 23:07; id. at 23:26.  It persisted as Mr. Lawhon desperately screamed and whimpered in a muffled voice, and tried to shift his body on three separate occasions so he could breathe.  Id. at 23:01-24:50.  Shockingly, it even persisted over several minutes during which Mr. Lawhon progressively became motionless, silent, and unresponsive.  Id. at 25:00-28:31.[3]  One of last sounds Mr. Lawhon can be heard making is a muffled moan, to which Officer Edwards responded, "Big dog, I'm 220lbs of come-get-you-some, so don't even try it, alright?"  Id. at 25:44-25:50.  Subsequent to that moment, Mr.

---

[3]     Defendants' continued use of force after Mr. Lawhon had become unresponsive (Ex. C at 26:20-28:31) is particularly disturbing given they had been specifically trained and advised through General Order 6-10 that such unresponsiveness was a sign of cardiac arrest requiring immediate medical attention.  Ex. B at 8.

Lawhon not only fell completely motionless and silent, but he also became completely unresponsive.[4]   Nevertheless, Defendants and EMS personnel can be seen restraining Mr. Lawhon in the prone position with his arms handcuffed and secured behind him while also applying weight and pressure to Mr. Lawhon's back for another two minutes and forty seconds. Id. at 25:50-28:30.  During that period of time, Officer Edwards shared a good laugh with others in the room as he applied weight and pressure to Mr. Lawhon's back, joking—of all things— about how he needed to lose weight.  Id. at 26:50-26:58.

When Defendants finally decided to end their use of force (an event quite literally brought about by the fact that Officer Edwards' knee was bothering him), they turned Mr. Lawhon onto his back.   Id. at 28:31.   At that time, Mr. Lawhon was motionless and unresponsive, with a blank, unmoving gaze fixed on his face, because he had asphyxiated to the point of cardiac arrest.  Compl. ¶ 45.  As a result, Mr. Lawhon suffered severe, irreversible brain damage and (ultimately) death.  Compl. ¶¶ 48-49.

<u>**ARGUMENT**</u>

Defendants seek dismissal of all counts asserted against them on the basis of qualified immunity.  For the reasons stated below, Defendants are not entitled to qualified immunity.

**I.     Defendants are not Entitled to Qualified Immunity as to Count I**.

    a.  General Principles Governing the Analysis of Qualified Immunity in the Context of Emergency Mental Health Seizures.

There are a total of six decisions by the Fourth Circuit assessing whether law enforcement officers were entitled qualified immunity with respect to an allegedly unconstitutional emergency mental health seizure.  Livingston v. Kehagias, No. 18-1906, 2020 U.S. App. LEXIS 5681, at *35 (4th Cir. Feb. 25, 2020); Goines v. Valley Cmty. Servs. Bd., 822

---

[4]     Specifically, Mr. Lawhon can be seen offering no response after being asked at two separate points if he was alright.  Ex. C at 27:10; id. at 28:10.

F.3d 159, 169 (4th Cir. 2016); Cloaninger v. McDevitt, 555 F.3d 324, 332 (4th Cir. 2009); Bailey v. Kennedy, 349 F.3d 731, 734 (4th Cir. 2003). S.P. v. City of Takoma Park, 134 F.3d 260, 264 (4th Cir. 1998); Gooden v. Howard Cty., 954 F.2d 960, 962-64, 67 (4th Cir. 1992). In the majority of these decisions, the Fourth Circuit held that the officers were entitled to qualified immunity. In each of those cases, two common analytical elements are present. Namely, each of those decisions involved circumstances in which the plaintiff's own conduct suggested to responding officers that he or she: (a) was suffering from some mental illness or mental disorder; and (b) there was an imminent risk of violence (either in the form of intentional self-harm or harming others) at the time that the officers took the plaintiff into custody. Livingston, 2020 U.S. App. LEXIS 5681, at *35 (police encountered a plaintiff who had made statements to the dispatcher indicating that he had attempted suicide earlier that day and who was pacing, throwing a beer can, gesticulating wildly, and verbally ranting about his frustrations with the Department of Veterans Affairs); Cloaninger, 555 F.3d at 332 (noting that officers encountered a plaintiff who had made statements to a VA doctor earlier that day which had prompted the doctor to call 911 and request police assistance for a potential suicide threat and officers had reason to believe that the plaintiff had access to firearms inside his home); Takoma Park, 134 F.3d at 264-67 (noting that the officers encountered an "obviously distraught and crying individual," who was "uncooperative, hostile, very upset, and irrational" and told the officers that, were it not for her children, she would end her own life); Gooden, 954 F.2d at 962-67 (noting the officers responded to three blood-chilling screams coming from the plaintiff's apartment and other sounds which indicated that the plaintiff was "mentally disordered" and had been intentionally attempting to harm herself by throwing her body into the walls and floors of her apartment).

In contrast, the Fourth Circuit has held that officers were not entitled to qualified immunity in those cases in which the plaintiff's own conduct did not demonstrate the presence of

a mental illness that created an imminent risk of violence. Goines, 822 F.3d at 169 (holding that there was no reasonable basis for officers to conclude that the plaintiff was a danger to himself or others where he had never threatened to do harm to himself or others); Bailey, 349 F.3d at 740-41 (holding officer lacked probable cause to take the plaintiff into custody despite reports that the plaintiff was depressed, suicidal, and intoxicated because the plaintiff's own conduct and statements furnished no evidence that he intended to harm himself).

Additionally, the Fourth Circuit's analyses in these decisions have identified other factual dynamics that inform the probable cause analysis. Those factual dynamics include: whether officers were reporting to the premises based on concerns of suicidality;[5] whether the plaintiff was in an agitated state when officers arrived on the scene;[6] whether the plaintiff was being evasive in response to officers' efforts to investigate his or her well-being;[7] whether the plaintiff had access to firearms or had taken some form of suicide preparations;[8] whether the plaintiff had

---

[5]    When the factual predicate for the encounter between officers and the plaintiff is reports of suicidality, that fact has been cited as weighing in favor of granting qualified immunity—although Bailey makes clear it is not conclusive on the issue. Livingston, 2020 U.S. App. LEXIS 5681, at *40; Cloaninger, 555 F.3d at 334; Takoma Park, 134 F.3d at 267; Gooden, 954 F.2d at 966. However, when the factual predicate for the encounter between officers and the plaintiff is not concerns of violence or suicidality, this fact has been construed as weighing against granting qualified immunity. Goines, 822 F.3d at 170.

[6]    The Fourth Circuit has consistently granted qualified immunity to officers who are confronted with an agitated plaintiff when they arrive at the scene. Livingston, 2020 U.S. App. LEXIS 5681, at *41; Takoma Park, 134 F.3d at 267. In contrast, the Fourth Circuit has denied qualified immunity in those circumstances where the plaintiff was not in an agitated state at the start of the encounter. Bailey, 349 F.3d at 740.

[7]    A plaintiff's evasiveness in response to officers' inquiries into the plaintiff's well-being has been treated as a factor weighing in favor of granting qualified immunity. Cloaninger, 555 F.3d at 332; Takoma Park, 134 F.3d at 268; see also Gooden, 954 F.2d at 963. In contrast, a plaintiff's responsiveness to an officer's inquiries into the plaintiff's well-being is cited as weighing against granting qualified immunity. Bailey, 349 F.3d at 740; see also Livingston, 2020 U.S. App. LEXIS 5681, at *41.

[8]    The Fourth Circuit has cited concerns that a plaintiff may be armed and/or have access to firearms as a fact weighing in favor of granting qualified immunity. Cloaninger, 555 F.3d at 334. It is has also cited the absence of such concerns as weighing against the existence of

a history of threatening suicide;[9] and whether the officers had received professional advice prior to taking the plaintiff into custody.[10]

      b.   Defendants Lacked Probable Cause that Mr. Lawhon was an Imminent Danger to Himself or Others.

With respect to the first prong of the qualified immunity analysis, Mr. Lawhon admitted to Defendants that he had experienced mind-altering effects from his prescription medication and that he suffered from Tourette's syndrome, anxiety, and depression. Ex. C at 11:58-13:34. Thus, it is quite clear that Defendants had probable cause to conclude that Mr. Lawhon was suffering from a mental illness or mental disorder at the time they took him into custody.

However, that concession does not end the probable cause inquiry. Defendants cannot justify their decision to take Mr. Lawhon into custody based merely on the fact that Mr. Lawhon suffered from a mental illness or mental disorder. Rather, for the seizure to comport with the Fourth Amendment, Defendants must have also known information furnishing probable cause to conclude that Mr. Lawhon's mental illness or mental disorder posed an imminent risk of danger at the time they took him into custody.[11] In other words, mere knowledge that the plaintiff is suffering from a mental illness or mental disorder alone is an insufficient basis for officers to

---

probable cause. Bailey, 349 F.3d at 740; see also Livingston, 2020 U.S. App. LEXIS 5681, at *41.

[9]    Cloaninger, 555 F.3d at 332 (discussing the plaintiff's history of threatening suicide as part of the factual information known to the officers that supplied probable cause to the take the plaintiff into custody for an emergency mental health evaluation).

[10]    The Fourth Circuit has noted that an officers' decision to perform an emergency mental health seizure of the plaintiff based on upon the professional advice of a treating nurse and a magistrate was reasonable because that professional advice furnished the requisite probable cause to take the plaintiff into custody. Cloaninger, 555 F.3d at 334.

[11]    The Fourth Circuit's analysis in Goines plainly demonstrates that the issues of "mental illness" is analytically distinct from the issue of "danger" and that there must be probable cause supporting both aspects of the governing standard for an officer to lawfully take an individual into custody for an emergency mental health evaluation. Goines, 822 F.3d at 169-70. The same is true under Virginia's statute setting forth the criteria issuance of an ECO. Va. Code Ann. § 37.2-808(A).

take the plaintiff into custody for an emergency mental health seizure.  Bailey, 349 F.3d at 741 (holding the officers lacked the requisite probable cause for an emergency mental health seizure despite knowing the plaintiff was intoxicated and reportedly suffered from depression); see also Burruss v. Riley, 192 F. Supp. 3d 655, 663 (W.D. Va. 2016).

Turning to the issue of dangerousness, the inescapable conclusion is that no aspect of Mr. Lawhon's conduct throughout the entire sequence of events alleged in the Complaint (and depicted in the video exhibits to the same) suggested that Mr. Lawhon was an imminent risk of substantial harm to himself or others.  Goines, 822 F.3d at 169 (holding that there was no reasonable basis for officers to conclude that the plaintiff was a danger to himself or others where he had never threatened to do harm to himself or others).  Much to the contrary, Mr. Lawhon repeatedly told officers he was fine and had no desire to harm himself or others.  Bailey, 349 F.3d at 735 (citing the plaintiff's denial of suicidal ideations in concluding that the officers lacked probable cause to take the plaintiff into custody for an emergency mental health evaluation).  While Mr. Lawhon had experienced intoxicating effects from his medication and had seemingly fallen over as a result, this type of conduct does not pose the sort of danger that justifies an emergency mental health seizure.[12]  Indeed, similar dynamics were present in Bailey, yet the officers were deemed to have lacked probable cause to take the plaintiff into custody for an emergency mental health evaluation.  Id. at 734 (noting the plaintiff was intoxicated to a degree that he had fallen off his bike, prompting his neighbor to call 911 and report that he intoxicated, depressed, and suicidal).  While Mr. Lawhon did make an irrational statement late in the encounter due to his mental illness, Defendants were even then confronted (at most) with "a

---

[12]     Nor was there any reason to believe that Mr. Lawhon had taken his prescription medication or fallen into the table in an effort to harm himself.  Mr. Lawhon denied doing so and Defendants specifically acknowledged as much in discussing the situation with EMS Mayes.  Ex. C at 13:50-14:00.

bizarre but non-dangerous incident" that did not justify an emergency mental health seizure. <u>Goines</u>, 822 F.3d at 170.

It is also worth highlighting that other factual aspects of this case are not in alignment with prior decisions finding that officers acted reasonably in taking an individual into custody for an emergency mental health evaluation.  <u>See</u> <u>Livingston</u>, 2020 U.S. App. LEXIS 5681, at *37 (comparing factual nuances of the case with the factual nuances of <u>Bailey</u> and <u>Cloaninger</u> in assessing whether officers were entitled to qualified immunity).  Specifically, Defendants were not reporting to the Premises with the understanding that Mr. Lawhon was suicidal (unlike the officers in <u>Livingston</u>, <u>Cloaninger</u>, and <u>Takoma Park</u>).  Rather, the factual predicate for Ms. Tunstall's call to 911 for assistance was simply that Mr. Lawhon had fallen and hit his face on a table.  Compl. ¶ 16.  Indeed, upon arriving at the Premises, Officer Edwards specifically confirmed that the basis for Ms. Tunstall's 911 call was that Mr. Lawhon had been "just falling around and stuff."  Ex. C at 02:51-02:57.  Moreover, like the plaintiff in <u>Bailey</u> (and unlike the plaintiffs in <u>Livingston</u> and <u>Takoma Park</u>) Mr. Lawhon was calm and responsive when Defendants arrived at the Premises.  A review of Exhibit C demonstrates that Mr. Lawhon answered all of Defendants' questions over a period of approximately 11 minutes in a manner that was largely coherent and appropriate.  Also, like the plaintiff in <u>Bailey</u> (and unlike the plaintiff in <u>Cloaninger</u>), Defendants had no reason to believe that Mr. Lawhon had been suicidal in the past, had access to weapons on the Premises, or had made other preparations in contemplation of suicide.  Finally, unlike the officers in <u>Cloaninger</u>, Defendants had not obtained confirmation from either a medical professional or a magistrate that their inclination to take Mr. Lawhon into custody was warranted under the circumstances.  <u>Cloaninger</u>, 555 F.3d at 333.  In fact, the medical evaluation performed in Defendants' presence by EMS Mayes confirmed that Mr. Lawhon was communicative and able to care for himself.

Taking these circumstances altogether, Defendants lacked probable cause to take Mr. Lawhon into custody for an emergency mental health evaluation. This has been the uniform conclusion of courts within the Fourth Circuit that consider the probable cause question in the context of a calm, responsive, and nonviolent individual who never threatened to harm himself or others. Goines, 822 F.3d at 169; Bailey, 349 F.3d at 735; Burruss, 192 F. Supp. 3d at 663. This Court should reach the same conclusion.

      c.   Defendants' Conduct Violated Clearly Established Law.

Turning to the second prong of the qualified immunity analysis, Defendants' seizure of Mr. Lawhon violated clearly established law. A right is clearly established in this regard if the "contours of the right [are] sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right." Bailey, 349 F.3d at 741 (4th Cir. 2003) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)) (internal quotation marks omitted). Importantly, for a right to be clearly established, courts do not require a "case directly on point," but instead only require that it "would be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted." Livingston, 2020 U.S. App. LEXIS 5681, at *9-10 (internal quotation marks omitted).

At bottom, the only "danger" that Defendants could have reasonably perceived was that Mr. Lawhon was previously intoxicated to a degree that he had fallen and was suffering from a nosebleed. Indeed, Defendants make much of these factual particulars. Defs.' Mem. in Supp. at 5 (arguing that the blood on Mr. Lawhon's face and clothing and his intoxicated state furnished probable cause to take Mr. Lawhon into custody). Bailey, however, presented similar dynamics. Bailey, 349 F.3d at 734 (noting that the officer found the plaintiff intoxicated in his home and the plaintiff had fallen off his bike prior to the officer's arrival at his home). Yet, the Fourth Circuit nonetheless held that "the police officers observed nothing that would indicate to them that

15

Michael might be a <u>danger</u> to himself." <u>Id.</u> at 741 (emphasis added).   Thus, <u>Bailey</u> makes clear that theoretical risks of harm inherent to observable intoxication are not the types of "danger" that justify taking an individual into custody for an emergency health evaluation, especially one who is otherwise calm, responsive, and denies any intent to harm himself or others.[13] <u>Id.</u> at 740-41.   That is certainly true here given Ms. Tunstall specifically advised Officer Edwards that Mr. Lawhon's disoriented behavior had since abated.   Ex. C at 14:21-14:31.

Additionally, there are other differences between the instant case and <u>Bailey</u> which only strengthen the argument that Defendants' conduct violated clearly established law.   In <u>Bailey</u>, the defendants were specifically responding to a suicide report.   <u>Id.</u> at 734.   Here, there was <u>never</u> any report that Mr. Lawhon was suicidal (or that he intended to harm himself or others).   Moreover, one of the reasons that the Fourth Circuit found probable cause lacking in <u>Bailey</u> is that the officer who first responded to the plaintiff's location ("Whitley") had questioned the plaintiff for five minutes and then exited the plaintiff's home, commenting to another officer outside of the home that "we're going to have to do something." <u>Id.</u> at 740.   The comment prompted the second officer ("Kennedy") to grab the plaintiff almost immediately.   <u>Id.</u>   The Fourth Circuit offered the following reasoning with respect to Kennedy's conduct:

> Certainly, no reasonable officer, upon seeing Officer Whitley voluntarily leave the house, would have thought that Michael was in such imminent danger of harming himself that immediate

---

[13] Drawing a distinction between the theoretical risks of harm posed by intoxication and the type of "danger" that justifies an emergency mental health seizure is important because—if one leans into the concept of intoxication deep enough—it would be possible to conclude that any intoxicated person poses some hypothetical risk of harm to himself or herself.   Indeed, one could theorize any number of such risks that were present under the facts in <u>Bailey</u>.   For example, the responding officer might have concluded that the plaintiff was a "danger" to himself in that he was overindulging in alcohol due to his reported depression and therefore might be a danger to himself if he continued to do so.   Alternatively, the responding officers might have concluded that the plaintiff's intoxication created a risk that he would put himself in danger in the sense that he might operate a motor vehicle, fall off his bike again, or unknowingly walk into an intersection despite an oncoming vehicular traffic.

> seizure was required, without any additional investigation, deliberation or consultation with Whitley, who had just been inside the house.  Moreover, even assuming that Whitley did say "we're going to have to do something . . ." to Kennedy as he arrived, there is nothing in the record to suggest that this brief, non-specific comment would have made a reasonable officer believe that immediate seizure was necessary. The contours of probable cause were sufficiently clear that the unlawfulness of seizing someone in such a situation would have been apparent to reasonable officers.

Bailey, 349 F.3d at 741-42.

Defendants face a similar problem in that the conduct of another person at the scene of the incident dispelled any probable cause of a risk of imminent harm that necessitated an immediate seizure of Mr. Lawhon.  Namely, a medical professional assessed whether Mr. Lawhon was mentally alert and able to care for himself in Defendants' presence.  Both EMT Tenley and EMT Mayes concluded from that evaluation that the immediate seizure of Mr. Lawhon for medical treatment would be "kidnapping" and that they could not legally touch Mr. Lawhon.  Ex. C at 17:15-17:24.[14]  Indeed, EMT Mayes intended to leave Mr. Lawhon in his own care and told Ms. Tunstall to call them back if Mr. Lawhon's mental status changed or if Mr. Lawhon became depressed.  Id. at 16:54-17:14.  EMT Mayes also directly advised Officer Edwards that Mr. Lawhon was "in control" and refusing care, therefore EMT Mayes could not legally touch him.  Id. at 17:54-18:07.  Nevertheless, almost immediately after EMT Mayes made these statements, Defendants pressed forward with grabbing Mr. Lawhon and taking him to the ground for an emergency mental health evaluation.  And, as in Bailey, their decision to do so was unreasonable and a violation of clearly established law.

The clear illegality of the seizure is further underscored by the fact that the Fourth Circuit clearly established in Cloaninger that the Fourth Amendment's general prohibition against

---

[14] The Fourth Circuit's decision in Cloaninger makes quite clear that the input officers receive from professionals informs the probable cause analysis.  Cloaninger, 555 F.3d at 333.

warrantless arrests occurring within the home applies in the context of emergency mental health seizures.   Cloaninger, 555 F.3d at 334 (citations omitted).   An officer is only entitled to circumvent the warrant requirement where exigent circumstances are present and, here, no such exigencies existed.   Id.[15]   Unlike the cited exigent circumstances present in Cloaninger, no medical provider had advised Defendants that Mr. Lawhon was at risk of harming himself, Mr. Lawhon had no history of threatening suicide, and there was no concern that he had access to firearms on the Premises.   Id.

Nor could Mr. Lawhon's observable intoxication and nosebleed be perceived as exigent circumstances requiring an immediate, warrantless seizure.   Indeed, the nonexigent nature of those circumstances is made evident in Officer Edwards' question to Ms. Tunstall which minimized Mr. Lawhon's prior conduct as "just falling around and stuff."   Ex. C at 02:51-02:57 (emphasis added).   Moreover, even if Defendants could have reasonably disregarded Mr. Lawhon's repeated efforts to advise them that he was fine and did not need medical care, the nonemergent nature of the circumstances was unquestionably apparent to them given: (a) the intent of medical personnel on the scene to leave Mr. Lawhon in his own care; and (b) Ms. Tunstall's statement to Officer Edwards explaining that Mr. Lawhon was no longer in the disoriented state which had prompted her 911 call.   Id. at 14:19-14:31.

At most, Defendants encountered an individual who was intoxicated, slurred his speech occasionally, and made an irrational statement.   And, although Mr. Lawhon had blood on his face and shirt, Defendants knew that the blood was simply from an innocuous nosebleed that had

---

[15] Under Virginia law, an officer may present to a magistrate for issuance of an emergency custody order which directs the officer to take an individual into custody for an emergency mental health evaluation.  Va. Code Ann. § 37.2-808(A).

occurred prior to their arrival.[16]   While these circumstances may seem novel on the face of a legal brief, they are exceedingly commonplace in day-to-day law enforcement operations. Indeed, the analysis in <u>Grayson v. Peed</u> specifically addresses the unremarkable and non-emergent nature of such scenarios.   In that decision, the Fourth Circuit held that and individual who was far more incapacitated than Mr. Lawhon was not suffering from an objectively serious medical need and a reasonable officer would not have perceived his incapacitation to require emergent hospitalization.   <u>Grayson v. Peed</u>, 195 F.3d 692, 695-96 (4th Cir. 1992).   Given as much, it cannot be reasonably claimed that an exigency existed here that permitted the warrantless seizure of Mr. Lawhon in his own home.

**II.     Defendants are not Entitled to Qualified Immunity with Respect to Count II**.

      a.   <u>General Legal Principles Governing the Defense of Qualified Immunity in Excessive Force Claims.</u>

Whether a law enforcement officer employed excessive force while effectuating a seizure is analyzed under the Fourth Amendment's "objective reasonableness" standard.   <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (<u>en banc</u>).   Namely, an officer's particular use of force will not be deemed "excessive" if the use of force was "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."   <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989).   More specifically, such an analysis requires that the Court consider the facts and circumstances as they existed at the moment that the officer employed the use of force at issue.   <u>Henry</u>, 652 F.3d at 531.   It also requires the Court to "view [the use of force] in full context, with an eye toward the proportionality of the force in light of all the circumstances."   <u>Waterman v. Batton</u>, 393 F.3d 471, 481 (4th Cir. 2005) (internal

---

[16]     There is no contention (and no reasonable officer would have believed) that any exigency existed by virtue of Mr. Lawhon's nosebleed.

quotation marks omitted).   To assess whether a given use of force is disproportionate to the attendant circumstances, the Court relies upon the three analytical guideposts articulated in Graham—i.e., "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   Graham, 490 U.S. at 396.   In addition to these factors, the Court's totality of the circumstances analysis takes into account the severity of the plaintiff's injuries that were caused by the challenged use of force.   Jones v. Buchanan, 325 F.3d 520, 530-31 (4th Cir. 2003).

      b.   <u>The Totality of the Circumstances Demonstrates that Defendants Employed Excessive Force During the Seizure of Mr. Lawhon.</u>

Turning to the first prong of the qualified immunity analysis, a consideration of the totality of the circumstances demonstrates that Defendants use of force violated the Fourth Amendment.   As to the first Graham factor (the severity of the crime at issue), it is well-settled that "[w]hen the subject of a seizure 'ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor.'"   Estate of Armstrong v. Village of Pinehurst, 810 F.3d 892, 899 (4th Cir. 2016) (citations omitted).   Here, Mr. Lawhon was not suspected of committing any crime and, accordingly, the first Graham factor heavily weighs against any use of force.   Bailey, 349 F.3d  at 743-44.

With respect to the second Graham factor, Mr. Lawhon did not pose an immediate threat to the safety of officers or other persons at the scene.   Defendants were aware that there were no weapons located on the Premises.   Throughout the entire encounter, Mr. Lawhon never expressed any intent to harm himself or others.   Additionally, Mr. Lawhon was outnumbered by the number of officers and EMS personnel at the scene and the video exhibits to the Complaint demonstrate that he was much lighter and smaller than Officer Edwards.   Smith v. Ray, 781 F.3d

95, 102 (4th Cir. 2015) (considering the fact that the officer was accompanied by another individual at the scene who could assist him if an altercation occurred and the relative size/weight differences between the officer and the plaintiff in assessing the second <u>Graham</u> factor).  Under such circumstances, "the threat to the safety of the officers or others was minimal, if it existed at all." <u>Bailey</u>, 349 F.3d. at 744.  Moreover, even if Mr. Lawhon's intoxicated state could have initially caused Defendants to experience some reasonable concern for their safety or the safety of others, no reasonable officer in Defendats' position would have perceived any such risk <u>after</u> Mr. Lawhon had been secured in handcuffs.  <u>Jones</u>, 325 F.3d at 529.  Thus, as to all times during the encounter—but certainly after Mr. Lawhon had been secured in handcuffs and restrained in the prone position—the second <u>Graham</u> factor weighs in favor of finding that Defendants used excessive force.  <u>Bailey</u>, 349 F.3d at 744.

Finally, as to the third <u>Graham</u> factor, it is clear that Mr. Lawhon was neither <u>actively</u> resisting arrest nor attempting to evade arrest by flight.  <u>Smith</u>, 781 F.3d at 102.  Certainly, it must be initially acknowledged that Mr. Lawhon was <u>passively</u> resisting being taken into custody in the form of verbal refusals to "turn around."  However, he never attempted to strike Defendants, turn away from them, or flee from the Premises.  <u>Id.</u> at 102-03.  Thus, the third <u>Graham</u> factor—at most—allowed for Defendants to use some minimal force to overcome that passive resistance <u>if</u> (and only if) the information known to Defendants supplied probable cause to believe that Mr. Lawhon was an imminent danger to himself or others.  <u>Estate of Armstrong</u>, 810 F.3d at 901.  If such probable cause was lacking, however, Mr. Lawhon was well within his rights under Virginia law to refuse being subjected to an unlawful arrest.  <u>Blevins v. Cabela's Wholesale Inc.</u>, No. 1:18-cv-00002, 2018 U.S. Dist. LEXIS 79960, at *18 n.4 (W.D. Va. May 11, 2018) (citing <u>Brown v. Commonwealth</u>, 27 Va. App. 111, 497 S.E.2d 527, 530 (Va. Ct. App. 1998)).  Under such circumstances, <u>any</u> use of force to restrain Mr. Lawhon would have been

unconstitutional as there would have been no basis to take him into custody.  Bailey, 349 F.3d at 745.

Even if the Court assumes the former rule rather than the latter rule governs this case, it cannot be reasonably disputed that the analysis as to the third Graham factor changes markedly at the moment that Officer Edwards secured Mr. Lawhon in handcuffs.  Ex. C at 22:36.  At that point in time, Mr. Lawhon was fully restrained and no longer resisting being taken into custody. Defendants, however, argue in their Memorandum in Support that their continued use of force on a secured, unarmed man who committed no crime was in response to and necessitated by his continued resistance in the form "kicking," "screaming," "flailing," and "thrashing." Defs.' Mem. in Supp. at 8.  Several points must be made about this argument.

First, Defendants' characterizations that Mr. Lawhon was "kicking," "flailing," and "thrashing" are—at their absolute best—overly-charitable, self-serving mischaracterizations of the events that actually occurred.  A review of Exhibit C reveals that (other than sporadic, nonthreatening finger movement), Mr. Lawhon attempted to move three times after being secured in handcuffs, and all of those efforts to move occurred in the initial two minutes after he had been handcuffed.  Id. at 23:03-24:51.  Mr. Lawhon's first effort to move was a slow, sluggish repositioning of his leg that looks nothing like "kicking" and was accompanied by Mr. Lawhon yelling "I can't breathe" in a muffled and frightened voice.  Id. at 23:01-23:10.  In response, Defendants and EMS personnel applied their weight against Mr. Lawhon's body as he—using a muffled and desperate voice—pleaded and yelled "[y]ou're killing me!"  Id. at 23:10-23:30.  Shortly thereafter, Mr. Lawhon again tried to reposition himself so that he could retrieve a breath of air and can be heard coughing and gasping.  Ex. C at 23:50-24:00.  Even then, however, he hardly moved at all because Defendants and EMS personnel were pinning him down.  Id.  Shockingly, they responded to Mr. Lawhon's efforts to breathe by immediately

applying more weight and pressure on Mr. Lawhon's extremities and back. Id. at 23:50-24:10. At that time, Mr. Lawhon began moaning and whimpering in a muffled voice—his face still being pushed into a pillow. Id. at 24:10-24:36. Mr. Lawhon's final effort to move occurred a few seconds later, a moment after Officer Edwards is seen leaning onto Mr. Lawhon's upper back with his fist. Id. at 24:48-24:50. At that time, Mr. Lawhon makes a desperate scream and attempts to move, but barely does so. Id. As before, Defendants and EMS personnel responded by applying additional weight and pressure to Mr. Lawhon's back and extremities, and continuing to force him face-down into a pillow. Id. Plaintiff respectfully submits that Defendants' efforts to label these latter two efforts by Mr. Lawhon to move as "flailing" and "thrashing" simply cannot be reconciled with what is revealed in the video evidence of the incident.

Moreover, no reasonable officer in Defendants' position would have perceived Mr. Lawhon's three attempts to breathe described above as "resistance" that warranted the continued restraint of Mr. Lawhon in a life-threatening position (i.e., in the prone position with his arms handcuffed behind him), much less doing so in conjunction with the application of additional weight and pressure to Mr. Lawhon's back that further impaired his breathing and forced him face-down into a pillow. Smith, 781 F.3d at 103 (holding that a suspect's resistance of trying to keep her arm underneath her body while officer was leaning on her back so she could breathe was not "resistance" within the meaning of the third Graham factor that could justify escalation of force). Indeed, Mr. Lawhon's efforts to preserve his respiratory function are exactly the response a reasonable officer would have expected to Defendants' chosen method of restraint. The DOJ Pamphlet appended to the Complaint as Exhibit A describes the "basic physiology of a struggle" in this regard:

> ▪ A suspect is restrained in a face-down position, and breathing

23

may become labored.
- Weight is applied to the person's back—the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs—the person struggles more violently.
- The officer applies more compression to subdue the individual.

Ex. A at 1-2.

Moreover, the unreasonableness of Defendants' attempts to rebrand Mr. Lawhon's efforts to breathe as "resistance" is further underscored by the fact that Mr. Lawhon's movements were accompanied by frightened screams that "I can't breathe" and "[y]ou're killing me." Smith, 781 F.3d at 103 (taking specific note that the suspect's refusal to put her arm behind her back was not "resistance" that justified the escalation of force given the suspect specifically advised the officer that the reason she was refusing to do so was to preserve her ability to breathe). In fact, Defendants themselves had been specifically trained that their chosen restraint technique would impair a suspect's efforts to breathe and increase the likelihood that the person being restrained would continue to struggle due to oxygen deficiency. Compl. ¶¶ 13-14. For that very reason, Defendants were required under departmental policy to refrain from restraining an individual in the prone position any longer than absolutely necessary. Id.[17] Indeed, at least as to Mr. Lawhon's third attempt to move, it is clear that Officer Edwards perceived that effort was due to respiratory difficulty as he specifically told EMS personnel to "make sure [Mr. Lawhon's] airway" was unobstructed shortly thereafter. Ex. C at 24:37.[18]

---

[17] While departmental policies and training do not themselves establish the constitutional standard, they can be probative evidence of what a reasonable officer would have understood under the circumstances and the reasonableness of an officer's use of force. Altman v. City of High Point, 330 F.3d 194, 219 (4th Cir. 2003); Wyatt v. Owens, 317 F.R.D. 535, 542 (W.D. Va. 2016).

[18] Similarly, although Officer Edwards subjective state of mind or intent is irrelevant to the excessive force analysis, the fact that he perceived Mr. Lawhon's efforts to move as an attempt to breathe is itself additional evidence that a reasonable officer on the scene would not have

Second, even if Mr. Lawhon's efforts to breathe during the first two minutes after he was handcuffed could be construed as "kicking," "flailing," or "thrashing" by a reasonable officer on the scene, Defendants fail to acknowledge that Mr. Lawhon was utterly motionless (again, apart from finger movements) at all points after his third attempt to move as described above. Nevertheless, Defendants and EMS personnel continued to restrain Mr. Lawhon in the prone position with his arms handcuffed behind him <u>for another three and a half minutes</u>.  <u>Id.</u> at 25:00-28:30.   Throughout that entire time, Defendants and EMS personnel can be clearly seen continuing to apply varying degrees of weight and pressure to Mr. Lawhon's back.   <u>Id.</u> Moreover, for the majority of that time, Defendants and EMS personnel continued to do so while pressing Mr. Lawhon face-down into a pillow.  <u>Id.</u> at 25:00-27:37.   At one point during that three-and-a-half-minute period of time, Mr. Lawhon's fingers clinched together and he can be heard moaning in a muffled voice.   <u>Id.</u> at 25:43-25:44.   In response, Officer Edwards applied more weight and pressure to Mr. Lawhon's back and taunted Mr. Lawhon, stating "Big dog, I'm 220lbs of come-get-you-some, so don't even if try it, alright?"  <u>Id.</u> at 25:44-25:50.  Subsequent to that moment, Mr. Lawhon not only fell motionless and silent, but he also became completely unresponsive.[19]   Nevertheless, Defendants and EMS personnel can be seen restraining Mr. Lawhon in the prone position with his arms handcuffed and secured behind him while also applying weight and pressure to Mr. Lawhon's back for another two minutes and forty seconds. <u>Id.</u> at 25:50-28:30.  During that period of time, Officer Edwards shared a good laugh with others in the room <u>while continuing to apply weight and pressure to Mr. Lawhon's back</u>, joking—of all things—about how he needed to lose weight.  <u>Id.</u> at 26:50-26:58.  Certainly, as to this three-and-

---

understood Mr. Lawhon's movements as the kind of "resistance" contemplated by the third <u>Graham</u> factor.

[19]    Specifically, Mr. Lawhon can be seen offering no response after being asked at two separate points if he was alright.  Ex. C at 27:06; <u>id.</u> at 28:10.

a-half-minute period of time that Mr. Lawhon was largely motionless, silent, and eventually unresponsive, the third Graham factor cannot be said to weigh in favor of Defendants' continued use of force (i.e., a deadly restraint position in conjunction with the application of force and weight to Mr. Lawhon's back that compressed his chest and diaphragm while also forcing him face-down into a pillow).  Bailey, 349 F.3d at 744 (holding that the third Graham factor did not completely weigh against the plaintiff, who initially resisted arrest, given the officers' use of force continued after the plaintiff had been secured in handcuffs and resistance had abated).

In short, with respect to the application of the Graham factors, this case stands on identical footing to the force deemed unconstitutional in Bailey.  Moreover, as to the final factor of the reasonableness analysis—the severity of the injury suffered—this case stands on even stronger footing than Bailey with respect to a finding of excessive force.  Although the plaintiff in Bailey suffered severe injuries in the form of a broken nose and a shoulder injury requiring surgeries, those injuries pale in comparison to the injuries that Defendants inflicted on Mr. Lawhon.  Namely, Mr. Lawhon—a man who committed no crime and posed no threat to officer safety—suffered cardiac arrest, severe brain damage, and death as a result of Defendants' use of force.  Compl. ¶¶ 48-49.  Accordingly, this factor also strongly weighs in favor of finding that Defendants' use of force in this case was excessive.  Jones, 325 F.3d at 530-31.  Given the foregoing analysis, the inescapable conclusion is that Defendants' use of force was unconstitutionally excessive in violation of the Fourth Amendment.

c.  Defendants' Conduct Violated Clearly Established Law in Multiple Ways.

Turning to the second prong of the qualified immunity analysis, the use of force at issue in this case ran afoul of clearly established law in multiple ways.  Demonstrating a violation of clearly established law does not require that "the very action in question has previously been held unlawful . . . ."  Wilson v. Layne, 526 U.S. 603, 615 (1999) (citations and internal

quotations omitted).   Rather, "[c]learly established" in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked."  Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992). In this case, Defendants' use of force violated Mr. Lawhon's clearly established rights by running afoul of two core constitutional principles in that Defendants: (a) employed deadly force without an adequate legal justification for doing so; and (b) employed gratuitous, disproportionate, and unnecessary force against an unarmed individual who had been secured in handcuffs.  Each of these points will be addressed below.

First, the use of force at issue here (i.e., the prolonged restraint of Mr. Lawhon in the prone position with his arms secured behind his back coupled with the application of weight/pressure to his back and appendages that impaired his ability to breathe and forced him face-down into a pillow for nearly six minutes) constituted the use of deadly force against an unarmed man who had committed no crime and posed no immediate threat to officer safety (much less a significant threat to officer safety).  This conclusion is borne out by the content of the DOJ pamphlet (appended to the Complaint as Exhibit A) and General Order 6-10 for the City of Richmond Police Department (appended to the Complaint as Exhibit B).  Estate of Armstrong, 810 F.3d at 902 (considering guidance promulgated by DOJ in assessing the severity of force to be assigned to the use of a taser); Thomas v. Holly, 533 F. App'x. 208, 218 (4th Cir. 2013) (considering departmental policy in concluding that an officer's strikes to the back of the head of a partially-handcuffed suspect in the prone position constituted the use of deadly force).  Those materials make clear that the risks associated with the use of the prone restraint technique on a suspect whose arms have been handcuffed behind him or her include asphyxiation and death.

Ex. A at 1-2; Ex. B at 8.[20]   Exhibit A also makes clear that the application of pressure on a suspect's back who has been restrained in the prone position can further compound the risks of asphyxiation associated with the prone restraint technique.  Ex. A at 1-2.  Both of those materials then go on to require officers to shift a suspect out of the prone position "immediately" after a suspect has been handcuffed (Exhibit A) or "as soon as possible" after the suspect has been handcuffed (Exhibit B) to "minimize the potential for in-custody injury or death."  Id. at 2 (emphasis added); Ex. B at 9 (emphasis added).  It is well-settled in the Fourth Circuit (and had been long before the events at issue in this case) that police officers cross a bright-line constitutional rule when they employ deadly force against an individual who poses no immediate threat to officer safety and that officers who do so are not entitled to qualified immunity.  See, e.g., Connor v. Thompson, 647 F. App'x. 231, 239 (4th Cir. 2016) (discussing existing decisional law and denying officers qualified immunity who used deadly force against a suicidal and incapacitated man in need of an emergency mental health evaluation after he refused the officers' repeated orders to drop a knife but did not behave in a threatening manner).  Defendants' use of force in this case violated this bright-line constitutional rule.

Moreover, at the time of the events at issue in this case, it had been clearly established within the Fourth Circuit that officers cross a bright-line constitutional rule by using any gratuitous, unnecessary, and disproportionate force on a secured, unarmed suspect. Young v. Prince George's Cnty., 355 F.3d 751 (4th Cir. 2004) (holding that an officer employed excessive force in driving his knee into the back of a suspect laying in the prone position and secured in handcuffs); Bailey, 349 F.3d at 745 (holding that the law was "especially clear that [the officers]

---

[20] Those same materials also clarify that the risk of an individual suffering from positional asphyxia and death is heightened by a number of other variables that were specifically present in this particular case, including: drug intoxication, a physical struggle between officers and the suspect, and unresponsiveness immediately after a physical struggle.  Ex. A at 2; Ex. B at 8.

were not entitled to use force after [the plaintiff] was secured face-down on the floor in handcuffs and leg restraints"); Kane v. Hargis, 987 F.2d 1005, 1006-07 (4th Cir. 1993) (denying qualified immunity on excessive force claim where the plaintiff resisted arrest for driving under the influence and the police officer, after he had secured her, repeatedly pushed her face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face). Indeed, this clear rule within Fourth Amendment jurisprudence recently led the District of South Carolina to deny officers qualified immunity in an excessive force case involving similar circumstances to those at issue in this case. McBeth v. City of Union, 2018 U.S. Dist. LEXIS 164121, at *39-46 (Sept. 25, 2018, D.S.C.). In fact, the instant case stands on even stronger footing than McBeth in this regard given the individual subjected to force in McBeth had assaulted an officer just prior to the officers' alleged unconstitutional use of force. Id. at *25.

Accordingly, for the foregoing reasons, Defendants' use of force violated clearly established law and Defendants are not entitled to qualified immunity.

## III.     Defendants are not Entitled to Qualified Immunity on Counts III-VI.

Defendants argue that they are entitled to qualified immunity on Counts III-VI, which assert state law causes of action based upon false arrest (Counts III-IV) and battery (Counts V-VI). Defs.' Mem. in Supp., at 10-11. Defendants invariably invoke the "clearly established" prong of federal qualified immunity analysis when asking the Court to dismiss each of these counts. Id. There is one simple problem with Defendants' argument—federal qualified immunity does not apply to state law claims. Cilman v. Reeves, 452 F. App'x 263, 268 n. 4 (4th Cir. 2011); Figg v. Schroeder, 312 F.3d 625, 644 n. 15 (4th Cir. 2002).

Instead—at least with respect to claims of false imprisonment (i.e., not claims of battery)—it appears that Virginia law may apply its own variant of qualified immunity ("good faith immunity") that asks whether the defendant "acted in good faith and with reasonable belief

in the validity of the arrest." <u>DeChene v. Smallwood</u>, 226 Va. 475 (1984).  However, the good faith immunity defense—unlike federal qualified immunity—is a defense to be argued to the jury; it is not an appropriate mechanism for disposition on the pleadings.  <u>Figg</u>, at 312 F.3d 625, 644 n. 15 ("Virginia's 'good faith' immunity does not spare a Virginia official the burden of a jury trial.").  Thus, even retrofitting the Defendants' argument for dismissal of the state law claims to the appropriate defense, Defendants have failed to articulate a valid ground for dismissal.

<u>C<small>ONCLUSION</small></u>

Accordingly, for the reasons stated herein, Ms. Lawhon respectfully requests that the Court deny Defendants' Motion and award her any other relief deemed appropriate.

DATE: April 2, 2020

Respectfully filed,

ANGELA L. LAWHON, as
ADMINISTRATOR of the
ESTATE OF JOSHUA L. LAWHON

By: _____/s/_____
Counsel

Jonathan E. Halperin, Esq. (VSB No. 32698)
Isaac A. McBeth, Esq. (VSB No. 82400)
Halperin Law Center, LLC
5225 Hickory Park Drive, Suite B
Glen Allen, VA 23059
Phone: (804) 527-0100
Facsimile: (804) 597-0209
jonathan@hlc.law
isaac@hlc.law
*Counsel for Plaintiff*