## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ANGELA L. LAWHON,         )
as Administrator of the Estate of   )
JOSHUA L. LAWHON,        )
                        )
        Plaintiff,      )
                        )
v.                           )      Civil Action No. 3:19-CV-924–HEH
                        )
JOHN EDWARDS, *et al.*,       )
                        )
        Defendants.    )

## MEMORANDUM OPINION
### (Defendants' Motions to Dismiss)

This civil rights and wrongful death action arises from the response of two Richmond City police officers, later accompanied by two Richmond Ambulance Authority ("RAA") medical technicians, to an individual in distress on January 16, 2018. According to the Complaint, Shaunna Tunstall ("Tunstall") called 911 in an attempt to secure medical assistance for her roommate, Joshua L. Lawhon ("Lawhon"). Based on Lawhon's presentation and Tunstall's explanation that Lawhon had been kicking and screaming on the floor, Officer John Edwards ("Officer Edwards") decided to transport Lawhon to a hospital for medical evaluation. In fact, Tunstall encouraged the officers to remove Lawhon from the residence, stating "[h]e needs to go out of here right now." [1]

---

[1] The Complaint does not reveal which of the occupants that evening was the lessee of the premises, and Lawhon's own statements throughout the encounter were contradictory. (*Compare* Compl. ¶ 23 ("We're in Shaunna's house."), *with* Compl. ¶ 24 ("Get out of my house.").)

(Compl. ¶ 24, ECF No. 1.)

During the course of restraining Lawhon, he lost consciousness and allegedly died from positional asphyxia, as a result of the force used to restrain him.[2]  Subsequently, Angela L. Lawhon, as Administrator of the Estate of Joshua L. Lawhon ("Plaintiff"), filed this lawsuit seeking damages for wrongful death, false arrest, battery, and violations of Lawhon's civil rights.[3]

This lawsuit is presently before the Court on Motions to Dismiss (ECF Nos. 9, 16, 18) filed by Defendants Officer Edwards, Lashaun Turner ("Officer Turner"), Alexander Mayes ("Mayes"), and Christopher Tenley ("Tenley") (collectively referred to as "Defendants").  They contend that their actions in response to what appeared to be a medical emergency are shielded by qualified immunity, good faith immunity, or state statute.  Alternatively, Defendants argue that Plaintiff's claims lack factual support.

As required by Federal Rule of Civil Procedure 12(b)(6), this Court's analysis at this stage is both informed and constrained by the four corners of the Complaint and documents incorporated therein.  Both sides have submitted memoranda supporting their

---

[2] No autopsy report or medical records pertaining to the actual cause of death have been made a part of the record at this stage.

[3] As alleged in the Complaint, the claims are as follows: unreasonable seizure effectuated without probable cause in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Count I); unreasonable seizure effectuated by excessive force in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Count II); false arrest in violation of Virginia law—survival claim (Count III); false arrest in violation of Virginia law— wrongful death claim (Count IV); battery in violation of Virginia law—survival claim (Count V); and battery in violation of Virginia law—wrongful death claim (Count VI).

respective positions, and the Court heard oral argument on July 30, 2020. For the reasons that follow, Defendants' Motions will be granted in part and denied in part.

## I.   BACKGROUND

Viewed in the light most favorable to Plaintiff, the facts are construed as follows for the purpose of resolving the Motions to Dismiss. The decedent, Joshua Lawhon, was a 32-year-old man with a prior history of paranoid schizophrenia. (Compl. ¶ 15.) On the evening of January 16, 2018, Lawhon's roommate—Tunstall—called the Richmond City Police "in an attempt to secure medical care" for Lawhon, and advised the dispatcher that Lawhon had fallen down and hit his nose, was bleeding, and needed to be restrained and transported to a hospital. (*Id.* ¶¶ 15–16.) As a result, the Defendant-officers were dispatched to the scene,[4] and they arrived at a house in clear disarray.[5] (*Id.* ¶ 17.) They immediately encountered Lawhon, who was conscious and responsive, but "had blood on his face and shirt from previously falling and hitting his nose on a table." (*Id.* ¶ 19.) He greeted the officers by saying, "I was just having a real bad day" and "I took some drugs that I shouldn't have that sent me to the pit of hell." (*Id.*) Officer Edwards told Lawhon

---

[4] Notably, as indicated in both the Complaint and the accompanying video attachments, law enforcement officials had already been at that location earlier that day to arrest an individual for an alleged assault, which was apparently unrelated to Lawhon's injuries and mental state. (Compl. ¶ 23; Officer John Edwards' Body-Worn Camera Video, Compl. Ex. C, at 0:29–1:12, 11:20–11:26, 15:41–16:07, ECF No. 1-4.)

[5] It is difficult to fully understand the chaotic nature of the home that evening without viewing the video evidence. For instance, there appears to be blood, along with a bloody rag, on the floor of the living space. (Compl. Ex. C, at 14:54–15:04.) Notably, these facts are conspicuously absent from the Complaint.

that they needed to get him to the hospital. (*Id.*) Lawhon adamantly declined. (*Id.*) Officer Edwards admonished Lawhon that if he did not want to go, "I'm going to have to medically ECO you."[6] (*Id.*)

As the conversation progressed, Lawhon became increasingly agitated. Tunstall informed Officer Edwards that Lawhon had earlier fallen on the floor and had been kicking and screaming. (*Id.* ¶ 20.) Lawhon further stated that he had fallen on the floor on purpose. (Officer John Edwards' Body-Worn Camera Video, Compl. Ex. C, at 2:39–2:50, ECF No. 1-4.) Tunstall also advised the officers that Lawhon had taken "[a] lot of" the prescription medication, Wellbutrin. (Compl. ¶¶ 21, 23.) Both Lawhon and Tunstall initially informed the officers that there were no weapons in the house, though Tunstall quickly clarified that she did not know. (*Id.* ¶ 21; Compl. Ex. C, at 4:44–4:51.) When Officer Edwards reiterated to Lawhon that he needed to go to the hospital or have an ambulance respond, Lawhon declined. "I'm fine, guys. I was just messed up for a little while." (Compl. ¶ 22.) He then ordered the police officers to leave the premises. (*Id.* ¶ 23.)

At that point, Emergency Medical Service ("EMS") technicians ("EMTs") Mayes and Tenley arrived. (*Id.*) Both Mayes and Tenley are employed by the RAA. (*Id.* ¶¶ 7–8.) Officer Edwards briefed the EMS personnel and pointed out that Lawhon had noticeable, self-induced injuries—as confirmed by Tunstall—and in the officer's opinion,

---

[6] The term "ECO" refers to an Emergency Custody Order governed by Va. Code Ann. § 37.2-808, which will be discussed in more detail at a later point.

needed EMS personnel to take a look at him.  (*Id.* ¶ 23.)  At that point, Lawhon reiterated

that he was not going to the hospital.  (*Id.*)  Officer Edwards then informed Lawhon that

he was going to remove him from the premises under a medical ECO because he was a

danger to himself and others.  (*Id.*)

 Mayes then asked Lawhon a series of questions, such as his name and the address

of "Shaunna's house," which Lawhon struggled to answer.  (*Id.* ("If you can't answer that

question [about what your name is], I have to take you to the hospital.").)  As Mayes

continued his questioning, Lawhon began to yell, which he then explained was a result of

his Tourette's syndrome.  (*Id.*)  Mayes next inquired if Lawhon wanted to go to the

hospital.  (*Id.*)  Lawhon declined, explaining that he felt "normal right now."  (*Id.*)

 Mayes continued to question Lawhon, and eventually told Lawhon that there was

nothing he could do for him if he did not want his assistance.  (*Id.* ¶ 24.)  Lawhon then

again reiterated his demand that the Defendants leave his house.  (*Id.*)  As the EMS

personnel prepared to depart, Tunstall exclaimed, "Hell, no.  Hell, no.  He needs to go out

of here right now. . . . Please."  (*Id.*)  She further advised Defendants that she could not

take care of his uncontrollable "mind thing," and that if he ended up dead that night, she

would not have done it.  (Compl. Ex. C, at 17:27–17:47.)  The EMS personnel, however,

declined to remove Lawhon from the premises based on his presentation and responses to

the questions posed.  (Compl. ¶ 24.)

 After 20 minutes of attempted counseling and trying to convince Lawhon to

voluntarily submit himself to medical evaluation at a hospital, Officer Edwards asked

Lawhon to turn around, and repeated his request several times, to which Lawhon adamantly refused. (Compl. Ex. C, at 20:45–21:30.) Officer Edwards then finally consented to Lawhon's repeated requests to have a cigarette, and he told Lawhon they could discuss the situation further after Lawhon smoked it. (Compl. ¶¶ 22, 25.) As Lawhon walked forward, Officer Edwards told Lawhon to "put your hands behind your back." (*Id.* ¶ 25.) Lawhon refused. (*Id.*) At that point, according to the Complaint, Officer Edwards grabbed Lawhon and threw him to the ground, forcing him into the prone position face down into a pillow. (*Id.* ¶ 26.)

With the assistance of Officer Turner and both EMS personnel, Officer Edwards held Lawhon down. (*Id.*) The Complaint alleges that approximately 37 seconds after making physical contact with Lawhon, Officer Edwards had secured Lawhon's hands behind his back with handcuffs. (*Id.* ¶ 27.) However, the officers and EMS personnel continued to hold Lawhon in the prone position and applied force to his back. (*Id.* ¶ 28.) Thirty seconds after he was handcuffed, Lawhon allegedly screamed, "I can't breathe." (*Id.* ¶ 29.)

The Complaint alleges that contrary to training and Richmond City Police Department ("RCPD") General Order 6-10,[7] the officers and EMS personnel failed to

---

[7] That General Order reads in pertinent part that
> Although rare, sudden in-custody death appears to be associated most often with the following variables: . . . The risk of positional asphyxia is compounded when an individual with predisposing factors (e.g., obesity, alcohol, high drug use . . .) becomes involved in a violent struggle with an officer, particularly when physical restraint includes the use of behind-the-back handcuffing in combination with placing the subject in a stomach-down position. . . . To minimize the potential for

reposition Lawhon to enable him to breathe, and "Mr. Lawhon's face continued to be pressed into the pillow." (*Id.* ¶¶ 29–31.) Lawhon initially "struggled to relieve the weight Defendants continued to apply to his back," and at some point, he even spit at the Defendants. (Compl. ¶¶ 30, 42.) However, Defendants continued to hold Lawhon down, and at some point, Lawhon failed to respond to Defendants and their use of force, as alleged in the Complaint and evinced in the video evidence. (*Id.* ¶¶ 32–35.) Officer Edwards then asked Lawhon if he was okay, but Lawhon did not respond. (*Id.* ¶ 32.)

Five minutes after Lawhon had been secured in handcuffs, EMS Tenley removed the pillow under Lawhon's face. (*Id.* ¶ 34.) Shortly thereafter, Officer Edwards again asked Lawhon if he was all right, and again, no response was provided. (*Id.* ¶ 35.) Lawhon was then turned over on his back, nearly six minutes after he had been initially secured in handcuffs, but he remained motionless and unresponsive. (*Id.* ¶ 36.) EMS Tenley examined Lawhon with his stethoscope, but none of the Defendants rendered any medical aid for an additional 93 seconds. (*Id.* ¶ 37.)

At that point, the officers and EMS personnel placed Lawhon on a stretcher and transferred him to an ambulance where the EMS personnel undertook resuscitative measures. (*Id.* ¶¶ 45–46.) Lawhon was then transported to Virginia Commonwealth University ("VCU") Hospital. (*Id.* ¶ 48.) According to the Complaint, Lawhon's pulse

---

in-custody injury or death, officers shall: . . . Get the subject of his/her stomach as soon after handcuffing as circumstances allow.
(RCPD Gen. Order 6-10(V)(I), Compl. Ex. B, at 8–9, ECF No. 1-3.)

was reestablished, but he had already suffered an irreversible hypoxic brain injury due to cardiac arrest and/or asphyxia. (*Id.*) He was pronounced brain dead two days later on January 18, 2018, and taken off life support on January 20, 2018. (*Id.* ¶ 49.)

Defendants challenge the viability of Plaintiff's claims on two fronts. Initially, they contend that they are entitled to immunity because their actions in taking Lawhon into custody for an emergency medical evaluation, and the force employed in doing so, were not contrary to any clearly established constitutional right at the time of his seizure. Alternatively, Defendants challenge the sufficiency of the Complaint to support Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6).

## I.   STANDARD OF REVIEW

"In reviewing a motion to dismiss for failure to state a claim, [a court] must 'accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). A motion under Federal Rule of Civil Procedure 12(b)(6) "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray*, 948 F.3d at 226 (alteration in original) (quoting *Tobey*, 706 F.3d at 387). However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

8

face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*,

556 U.S. at 679). A court, however, "need not accept legal conclusions couched as facts

or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at

644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

In ruling on a motion to dismiss, a court may also "consider documents attached to

the complaint, 'as well as those attached to the motion to dismiss, so long as they are

integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir.

2019) (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

"[I]n the event of conflict between the bare allegations of the complaint and any exhibit

attached . . . , the exhibit prevails." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166

(4th Cir. 2016) (alteration in original) (quoting *Fayetteville Inv'rs v. Commercial

Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)). This is based on "the presumption

that the plaintiff, by basing his claim on the attached document, has adopted as true the

contents of that document." *Id.* at 167. However, "before treating the contents of an

attached or incorporated document as true, the district court should consider the nature of

the document and why the plaintiff attached it," and it should consider whether plaintiff

relied on the attachment for its truthfulness.[8] *See id.* at 167–69; *see also Wallace v. Baylouny*, No. 1:16-cv-47, 2016 WL 3059996, at *4 (E.D. Va. May 31, 2016).

In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

## II.   DISCUSSION

### A. The Court will grant Defendants' Motions to Dismiss as to Count I of Plaintiff's Complaint, claiming the Defendants effectuated an unreasonable seizure without probable cause.

Prior to assessing the factual sufficiency of Plaintiff's claims, the Court must first address the Defendants' entitlement to qualified immunity.[9] The Defendant-officers argue that they had probable cause to believe that Lawhon was experiencing a mental

---

[8] In this case, Plaintiff specifically incorporates the video attachments into her Complaint, as she has inserted transcriptions of the videos throughout her pleading. Indeed, the bulk of the Complaint's recitation of the facts comes from the transcriptions of the body camera videos. Furthermore, Plaintiff specifically relies on the truthfulness of the videos to support her claims. Accordingly, the Court finds that Plaintiff has adopted as true the contents of the videos and that she finds them to be an accurate depiction of the events that occurred on January 16, 2018. Therefore, in the event of any conflict between the allegations in the Complaint and the video attachments, the attachments must prevail. *See Goines*, 822 F.3d at 166.

[9] Notably, Defendant Mayes asserts that he is also entitled to sovereign immunity as to Plaintiff's federal law claims, citing Virginia's sovereign immunity doctrine. However, qualified immunity is the appropriate defense to Plaintiff's federal law claims, not Virginia's state immunity doctrine. *See Martinez v. California*, 444 U.S. 277, 284 n.8 (1980); *cf. Cromartie v. Billings*, 837 S.E.2d 247, 254 (Va. 2020). Furthermore, for the reasons discussed *infra*, Virginia's sovereign immunity doctrine would not provide a defense for Defendant Mayes's alleged intentional conduct.

health crisis that required a mental health evaluation, or at the very least, it was not clearly established that a reasonable officer would have known that probable cause for such an evaluation was lacking. The Defendant-EMTs maintain that they cannot be held liable for the officers' determination that probable cause existed to seize Lawhon, and that they themselves did not initially take Lawhon into custody.

The United States Supreme Court has continually admonished trial courts that qualified immunity should be addressed at the earliest stage of the proceedings. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). "The doctrine of qualified immunity 'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Meyers v. Baltimore County*, 713 F.3d 723, 730–31 (4th Cir. 2013) (quoting *Pearson*, 555 U.S. at 231). It ensures that officials can perform their duties free from the specter of endless and debilitating lawsuits. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "The doctrine shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers*, 713 F.3d at 731 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Id.* (citing *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003)).

The mechanics of applying the qualified immunity doctrine was best articulated by

the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), and later as refined in

*Pearson v. Callahan*, 555 U.S. 223 (2009).  As explained in *Saucier*, application of the

qualified immunity doctrine "requires a two-step approach, under which a court first must

decide whether the facts alleged or shown, taken in the light most favorable to the

plaintiff, establish that the police officer's actions violated a constitutional right."

*Meyers*, 713 F.3d at 731.  If a plaintiff satisfies this initial step, the court next determines

whether the right at issue was "clearly established" at the time of the officer's alleged

misconduct, such that it would be clear to an objectively reasonable officer that his

conduct violated that right.  *Id.*

In *Pearson*, the Supreme Court modified the *Saucier* analysis by permitting lower

courts to proceed directly to the question of whether a reasonable police officer would

have known that his conduct violated a clearly established right.  *Pearson*, 555 U.S. at

236 ("The judges of the district courts and the courts of appeals should be permitted to

exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular

case at hand.").  However, the Supreme Court advised that while "the *Saucier* protocol

should not be regarded as mandatory in all cases, we continue to recognize that it is often

beneficial."  *Id.*

As the United States Court of Appeals for the Fourth Circuit stressed in

*Torchinsky v. Siwinski*, the test for entitlement to qualified immunity distills to one of

objective reasonableness.  942 F.2d 257, 261 (4th Cir. 1991).  "This objective test

12

involves an inquiry into whether a government official has violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow*, 457 U.S. at 818).

The Fourth Circuit has said unequivocally that "the right allegedly violated must be defined 'at a high level of particularity.'" *Braun v. Maynard*, 652 F.3d 557, 562 (4th Cir. 2011) (quoting *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007)). To determine whether a right was clearly established, the court must consider whether controlling authority, or a "robust consensus of persuasive authority," *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538–39, 544 (4th Cir. 2017) (internal quotation marks omitted), would have given the officers "fair warning that their conduct was wrongful." *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018) (internal quotations and citations omitted). However, as the Supreme Court and the Fourth Circuit have recognized, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Meyers*, 713 F.3d at 734 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Under this formulation, a plaintiff may prove that an official has violated his rights, but an official is nonetheless "entitled to qualified immunity if a reasonable person in the officer's position 'could have failed to appreciate that his conduct would violate those rights.'" *Id.* at 731 (quoting *Torchinsky*, 942 F.2d at 261). Furthermore, "[t]he very idea of reasonableness requires that courts accord interpretive latitude to official judgments." *Torchinsky*, 942 F.2d at 261 (citing *Sevigny v. Dicksey*, 846 F.2d 953, 957

13

(4th Cir. 1988)).  As the Fourth Circuit noted in *S.P. v. City of Takoma Park*, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." 134 F.3d 260, 266 (4th Cir. 1998) (citation omitted).

While the law clearly requires probable cause prior to undertaking a mental health seizure, what constitutes probable cause in this context is less clear.  *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015) (citations omitted).  As the Fourth Circuit indicated in *Raub*, "we have . . . noted a distinct 'lack of clarity in the law governing seizures for psychological evaluations,' compared with the 'painstaking[]' definition of probable cause in the criminal arrest context." *Id.* (second alteration in original) (quoting *Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir. 1992)).  Critical in the Court's analysis of mental health-related seizures is whether the officers "had ample opportunity to observe and interview" the person seized, "'did not decide to detain [the individual] in haste,' and acted pursuant to state law authorizing mental health seizures . . . ."[10] *Id.* at 883 (quoting *City of Tacoma Park*, 134 F.3d at 267–68).

Provided that certain criteria are satisfied, the law of the Commonwealth of Virginia permits law enforcement officials to take an individual into emergency custody for mental evaluation.  Section 37.2-808(G) of the Virginia Code provides that:

> A law-enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody as stated in this section may take that person into

---

[10] As in the immediate case, in both *City of Tacoma Park* and *Gooden*, the detainee denied any psychiatric problems and appeared to the defendant-officers as evasive and uncooperative. *City of Tacoma Park*, 134 F.3d at 268; *Gooden*, 954 F.2d at 962–63.

14

custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.

Va. Code Ann. § 37.2-808(G).

That statutory provision also provides criteria to guide law enforcement personnel in deciding whether emergency custody is appropriate, stating the detaining officers must have

> [P]robable cause to believe that any person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Va. Code Ann. § 37.2-808(A).

With two exceptions, the Fourth Circuit has uniformly granted qualified immunity to law enforcement for seizures in the mental health context. *See Raub*, 785 F.3d at 882–83 ("[A]ll of our decisions involving mental health seizures have involved circumstances in which law enforcement officers seized an individual because they feared he or she might be a danger to him- or herself. In most of these cases, we granted qualified immunity to the seizing officers."). The only cases in which the Fourth Circuit has denied qualified immunity for seizures in the mental health context were *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003), and *Goines v. Valley Community Services Board*, 822 F.3d 159 (4th Cir. 2016).

15

In *Bailey*, law enforcement officials detained the plaintiff based merely on a 911 report that he was depressed, suicidal, and intoxicated. 349 F.3d at 734. Bailey, however, denied thoughts of suicide, declined to give the officers permission to search the house, and ordered them to leave. *Id.* In *Goines*, Goines himself, rather than through a third-party complaint, sought police assistance to avoid a potentially physical confrontation with a neighbor who had spliced his cable line. 822 F.3d at 170. The Fourth Circuit found that "the facts as alleged by Goines—the involuntary detention of a man with physical disabilities who exhibited no signs of mental illness and made no threats of harm—[were] sufficiently beyond the realm of probable cause that no reasonable police officer would find them adequate." *Id.* With this preface, the Court will turn to the case at hand.

While Plaintiff appears to acknowledge that the Fourth Circuit has consistently recognized that mental health seizures present issues beyond the kin of most well-trained law enforcement officers, she argues that nothing about Lawhon's presentation suggested that he was suffering from a mental disorder which posed a significant risk of harm to himself or others. To support this contention, she highlights the assertion by one of the EMTs that he saw no basis for an emergency mental health evaluation. However, it is important to keep in mind that the police officers had the additional responsibility for the safety of the other occupant of the residence, Tunstall, who not only wanted him removed from the premises, but placed the initial 911 call "in an attempt to secure medical care for Mr. Lawhon." (Compl. ¶¶ 15, 24.)

16

Lawhon admitted to the officers that he "had experienced mind-altering effects from his prescription medication and that he suffered from Tourette's syndrome, anxiety, and depression." (Pl.'s Mem. Opp'n at 12, ECF No. 20.) Plaintiff further admits that the tenor of Lawhon's language and emotions escalated as his conversations with the officers progressed. (*Id.* at 5–6.) In fact, Plaintiff candidly concedes that "it is quite clear that [the officers] had probable cause to conclude that Mr. Lawhon was suffering from a mental illness or mental disorder at the time they took him into custody." (*Id.* at 12.) But Plaintiff maintains that the officers lacked "probable cause to conclude that Mr. Lawhon's mental illness or mental disorder posed an imminent risk of danger at the time they took him into custody." (*Id.*) Plaintiff's argument, however, carefully navigates around the import of several other pertinent facts.

As EMS personnel prepared to depart, following Lawhon's order to get out, Tunstall interceded and said, "Hell, no. Hell, no. He needs to go out of here right now. . . . Please." (Compl. ¶ 24.) Plaintiff appears to discount the significance of Lawhon's roommate's plea for help, who summoned the police to her residence. She also informed the officers that earlier that evening, Lawhon had fallen on the floor and had been kicking and screaming. (*Id.* ¶ 20.) Tunstall's characterization of Lawhon's earlier behavior is supported by Lawhon's appearance—when the officers arrived, Lawhon's face and shirt were covered in blood, as alleged in the Complaint and as clearly depicted in the videos attached to Plaintiff's Complaint. (*Id.* ¶ 19.) When the EMTs began to depart without Lawhon, Tunstall then exclaimed that if Lawhon died that night, she would not have been

17

the one to have done it, evincing an incredible fear that he would cause further harm to himself that night.

Accordingly, applying Virginia's statutory provisions authorizing law enforcement officers to take an individual into emergency custody, the facts as adduced by the Complaint and video attachments establish that the Defendant-officers, based on their personal observations as well as Tunstall's reports, had probable cause to believe that: (1) Lawhon had a mental illness, as Plaintiff readily concedes; (2) there was a substantial likelihood that Lawhon, as a result of this illness, would in the near future cause serious physical harm to himself or others, as demonstrated by Lawhon's bloodied appearance, Lawhon's incoherent statements, the information provided that his injuries were self-induced, the fact that Lawhon had previously been falling down on purpose, the fact that Lawhon had ingested "[a] lot of Wellbutrin," and Tunstall's clear and resonating fear of what Lawhon would do if the officers left; (3) Lawhon was in need of hospitalization or treatment, which Officer Edwards repeatedly implored Lawhon was necessary and continually assured him that any detention would be only for medical oversight; and (4) Lawhon was unwilling to voluntarily receive hospital treatment, as evinced by his repeated refusals to accompany the Defendants to the hospital. *See* Compl. ¶¶ 16–24; Va. Code Ann. § 37.2-808.

Thus, based off the facts alleged and presented to this Court, taken as true, the Defendant-officers, pursuant to statute, had probable cause to believe that Lawhon met the criteria necessary for emergency custody, and thus acted reasonably in seizing

18

Lawhon. *See Smith v. Town of South Hill*, __ F. Supp. 3d __, 2020 WL 1324216, at *27

(E.D. Va. Mar. 20, 2020) (Lauck, J.) ("[W]hen officers comply with the Virginia statute

that creates emergency custody orders, even if such an order has not been issued by a

Virginia magistrate, the arrest is *per se* reasonable for the purposes of the Fourth

Amendment." (internal citations, quotations, and footnotes omitted)).  Accordingly,

Plaintiff has failed to state a violation of Lawhon's constitutional rights, that is, that the

Defendant-officers effectuated an unreasonable seizure without probable cause in

violation of Lawhon's Fourth and Fourteenth Amendment rights.[11]  *See Raub*, 785 F.3d at

882 ("Our previous decisions concerning seizures for mental health evaluations have

indeed emphasized a 'general right to be free from seizure' absent a finding of probable

cause.'" (quoting *Gooden*, 954 F.2d at 968)); *City of Takoma Park*, 134 F.3d at 274

("Because the officers had probable cause to detain Peller for the limited purpose of

transporting her to [the hospital] for an emergency mental evaluation, no constitutional

violation occurred.").

---

[11] In her Complaint, Plaintiff merely asserts that the seizure in this case was unreasonable because the Defendants allegedly lacked probable cause.  However, the Fourth Circuit has instructed that an additional factor must be considered when a seizure is effectuated *within the home*.  *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009). In *Cloaninger*, the court concluded that its determination "that the defendants had probable cause to seize Cloaninger and detain him for the purposes of a psychological evaluation" did not end its inquiry into the reasonableness of the defendants' actions.  *Id.*  "While probable cause is sufficient to effect a seizure, the unique qualities of the home prohibit seizures there without a warrant or exigent circumstances. . . . Exigent circumstances exist when there is 'a risk of danger to the police or to other persons inside or outside the dwelling.'"  *Id.* (quoting *United States v. Moses*, 540 F.3d 263, 270 (4th Cir. 2008)).  Like the Fourth Circuit in *Cloaninger*, this Court similarly finds that the Defendants reasonably concluded that the circumstances were exigent as the alleged facts established that Lawhon was an imminent danger to himself.  *See id.*

Furthermore, Plaintiff has failed to state a claim against the Defendant-EMTs as to Count I. As an initial matter, and as the Defendant-EMTs contend, it is axiomatic that—because the Defendant-officers had probable cause to detain Lawhon, and their decision to detain Lawhon was reasonable—the Defendant-EMTs did not violate Lawhon's Fourth Amendment right when they assisted the officers in detaining Lawhon. Moreover, Plaintiff's legal conclusions that all of the Defendants are liable for effectuating the initial seizure of Lawhon are belied by the detailed factual allegations in her Complaint, which are supported by the video evidence. As Plaintiff specifically alleges, it was Officer Edwards who "decided that he would still attempt to take Mr. Lawhon to a hospital against his will," and it was Officer Edwards who "grabbed Mr. Lawhon and threw him to the ground," thereby effectuating the initial seizure of Lawhon, and allegedly doing so without probable cause. (Compl. ¶¶ 25–26.) Plaintiff alleges that Officer Turner and the Defendant-EMTs only assisted in detaining and holding Lawhon down *after* Officer Edwards grabbed Lawhon, threw him down, and forced him into the prone position. (Compl. ¶ 26.) This assistance may implicate the Defendant-EMTs in Plaintiff's excessive force claim; however, the Defendant-EMTs cannot be held liable for any alleged violation of an unreasonable seizure effectuated without probable cause.

Importantly, even if Officer Edwards' actions could be imputed to his fellow officer—Officer Turner—emergency medical providers cannot take an individual into custody against his will, as the Defendant-EMTs maintain and as they informed the officers, Lawhon, and Tunstall on the night in question. Instead, they must rely on the

20

decisions and actions of law enforcement personnel. *See Raub v. Campbell*, No. 3:13cv328–HEH, 2014 WL 130974, at *4 (E.D. Va. Jan. 14, 2014) ("[A]n initial detention pursuant to an Emergency Custody Order . . . can only be conducted under the order of a magistrate judge or the authority of a law enforcement officer. Thus, while Campbell may have had authority to provide advice and counsel to the officers, the decision to detain Raub resided with the officers as a matter of law." (internal citations and quotations omitted)). It was Officer Edwards, as pled in the Complaint, who determined that Lawhon needed to be seized, and who effectuated the initial take down of Lawhon. Because this Court has found that Officer Edwards had probable cause to detain Lawhon, it was reasonable for the Defendant-EMTs to rely on his determination that further medical evaluation was necessary. *See Raub*, 785 F.3d at 881 ("[Qualified immunity] provides for immunity from suit where a state actor's conduct is objectively reasonable under the circumstances."). Accordingly, this Court finds that Plaintiff has failed to establish that the Defendant-EMTs violated Lawhon's constitutional right to be free from unreasonable seizures effectuated without probable cause.

Therefore, this Court finds that, at step one of the two-step inquiry, all of the Defendants are entitled to qualified immunity. *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) ("Because Cloaninger's evidence on summary judgment fails to establish any objectively unreasonable conduct, he cannot prove that the defendants violated a clearly established constitutional right. Thus, qualified immunity bars Cloaninger's suit . . . ."). However, even if the Defendant-

officers lacked probable cause to seize Lawhon, and thus violated Lawhon's Fourth

Amendment right, it was not clearly established in January 2018 that Defendants'

conduct clearly violated this constitutional right. *See Raub*, 785 F.3d at 884 ("In sum, we

think it doubtful that Campbell violated Raub's Fourth Amendment rights based on our

existing precedent. We need not, however, pass on that question because we hold that

Campbell is entitled to qualified immunity on the ground that the unlawfulness (if any) of

his conduct was not clearly established at the time he recommended Raub's seizure.").

As the Fourth Circuit artfully detailed in *Gooden*,

> [T]he costs of inaction may be readily appreciated. Had the officers left alone
> a woman from whom they had thrice heard blood-curdling screams and
> whose apparent condition had caused another citizen to twice call them to
> the scene, they may have been derelict in their duty. The course of caution
> in these circumstances may well have been to bring the individual in for some
> sort of emergency care or evaluation which might alleviate a potentially
> serious situation. Had the officers done nothing—and had Ms. Gooden hurt
> herself or someone on the premises—the consequences may have been
> irremediable. It is a misguided application of § 1983 to expose to liability
> those who by all objective indicia were only trying to help. It is further all
> too facile to suggest that the officers should have walked away from the
> situation because Gooden evidenced no injuries at the time they were with
> her. If the officers had refused to act until they saw blood, bruises and
> splintered furniture, it might have been too late for Gooden or her neighbors.

954 F.2d at 967 (internal citations and quotations omitted). Here, given Lawhon's

presentation and demeanor upon the officers' arrival, and Tunstall's clear concern for

Lawhon's safety, the record establishes that, had Defendants walked away, more tragedy

could have occurred at that premises that evening.

The Fourth Circuit then strengthened *Gooden*'s holding six years later in *City of*

22

*Takoma Park.* In that case, the court held that

> Reasonable officers, relying upon our decision in *Gooden* and the other
> circuit court decisions addressing similar situations, would have concluded
> that involuntarily detaining Peller was not only reasonable, but prudent. As
> in *Gooden*, these officers were responding to an emergency call from a
> concerned third-party alerting them of a potentially dangerous situation.
> Also, as in *Gooden*, even though the individual exhibited no signs of physical
> abuse and denied any psychiatric problems, the officers perceived Peller to
> be evasive and uncooperative. Finally, the officers were acting in reliance
> upon the same Maryland involuntary commitment statute we cited with
> approval in *Gooden*. Based upon the foregoing, we conclude that there was
> no clearly established authority available which would have notified these
> officers that their conduct was unlawful. As a result, they are entitled to
> qualified immunity.

*City of Takoma Park*, 134 F.3d at 267–68 (internal citations, quotations, and footnotes

omitted). The facts in the immediate case are even stronger. Here, there were signs of

physical abuse, and both Tunstall and Lawhon reported that Lawhon had previously been

falling down.[12] Furthermore, Lawhon was evasive in his responses to the Defendants, at

times screaming at them and at other times struggling to answer even the most

straightforward questions. He also indicated his yelling was the result of his Tourette's

syndrome, and that he had just taken "some drugs that [he] shouldn't have that sent [him]

to the pit of hell." (Compl. ¶¶ 19, 23.) The Defendants were also responding to

Tunstall's 911 call, and were aware of her repeated pleas for help. Finally, the officers

were acting in reliance on Virginia law, and repeatedly told Lawhon that they were going

---

[12] Tunstall also informed the Defendants that the house had previously been clean, but because of
Lawhon's behavior, it was now torn up. (Compl. Ex. C, at 14:54–15:04.) Furthermore, the
video evidence shows what appears to be blood on the floor, as well as a bloody rag. (*Id.*)

to need to ECO him if he did not submit himself voluntarily to medical review. Notably, Officer Edwards thoroughly and repeatedly explained to Lawhon the nature of the detention, and even recited the basic elements of Virginia's ECO statute to Lawhon. (Compl. Ex. C, at 8:10–9:56, 18:22–20:47.) Yet, Lawhon emphatically and steadfastly refused to leave.

In sum, the Defendant-officers' decision to seize Lawhon, and the initial seizure, were informed by both Tunstall's 911 call and their own personal observations, which collectively supported the Defendant-officers' conclusion that Lawhon was a danger to himself. Furthermore, the Defendant-officers acted in reasonable reliance on Virginia's emergency custody statute. Finally, the Defendant-officers' actions were clearly consistent with a formidable arsenal of published authority supporting the reasonableness of official action in similar situations. *See Raub*, 785 F.3d at 882–84. Accordingly, the Court finds Plaintiff has "failed to allege facts demonstrating the violation of clearly established law." *City of Takoma Park*, 134 F.3d at 265; *see Gooden*, 954 F.2d at 968–69.

With respect to the Defendant-EMTs, even if Plaintiff could make out a viable constitutional claim for lack of probable cause against these Defendants, which this Court has found she cannot, Plaintiff fails to cite any authority supporting her contention that the Defendant-EMTs' assistance, following Officer Edwards' initial seizure, clearly violated the Fourth Amendment's proscription against seizures effectuated without

probable cause.[13]  Indeed, the Fourth Circuit has indicated that there is a finite well of authority governing similar claims against state actors who are not employed by law enforcement agencies.  *See Raub*, 785 F.3d at 881–84 ("While [our] cases outline the standard for probable cause in situations where law enforcement officials must decide whether to detain an individual on the belief that he might be a danger to himself, they provide less guidance here.  Indeed, none of the cases delineates the appropriate standard where a mental health evaluator must decide whether to recommend a temporary detention on the belief that an individual might be a danger to others. . . . Nonetheless, to the extent the cases should have informed Campbell's conduct, they support the view that he acted reasonably under our prevailing legal standards.").  In the absence of authority clearly establishing the violation of any constitutional right as to the initial seizure of Lawhon, the Court finds that the Defendant-EMTs must be protected by qualified immunity.  *See id.* at 881 ("[W]e hold that because Campbell's conduct was not proscribed by clearly established law, summary judgment on the basis of qualified immunity was proper.").

---

[13] Notably, after briefing on the Motions to Dismiss closed, Plaintiff filed a Motion to Strike the Affirmative Defense of Qualified Immunity from Defendant Tenley's Answer (ECF No. 48).  In her Memorandum in Support of that Motion, Plaintiff appears to concede the lack of authority on this subject, but insists that this "dearth of authority" supports her contention that "EMS providers in Virginia have no authority to engage in [the] type of conduct at issue in this suit." (Pl.'s Mem. Supp. Mot. Strike at 3 n.1 (emphasis omitted), ECF No. 49.)  However, qualified immunity ensures that officials are protected from liability unless their conduct violated clearly established law.  *See City of Takoma Park*, 134 F.3d at 265.  In the absence of any law clearly establishing this alleged constitutional violation—that is, that the Defendant-EMTs effectuated an unreasonable seizure of Lawhon without probable cause—the Defendant-EMTs are entitled to the protection of qualified immunity.

The law dictates that officials are immune from civil liability for their alleged

conduct unless both aspects of the qualified immunity test are established. In this case, as

to Count I, neither element of that analysis is satisfied. Therefore, Count I of Plaintiff's

Complaint must be dismissed.

### B. The Court will grant in part and deny in part Defendants' Motions to Dismiss as to Count II of Plaintiff's Complaint, claiming the Defendants employed excessive force in effectuating Lawhon's seizure.

Plaintiff next claims that Defendants employed excessive force to physically

restrain Lawhon in violation of the Fourth and Fourteenth Amendments, and that the use

of said force directly and proximately caused Lawhon's pre-death pain and, ultimately,

his death. The Fourth Circuit has recently addressed both prongs of the qualified

immunity test as it pertains to excessive force claims.

The Fourth Circuit reiterated the test district courts are required to apply in

determining whether officials' use of force violates the Fourth Amendment in *Estate of

Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016). "A

claim that law enforcement officials used excessive force in the course of making an

arrest, investigatory stop, or other seizure of a person is properly analyzed under the

Fourth Amendment's objective reasonableness standard." *Armstrong*, 810 F.3d at 899

(internal quotation and alteration marks omitted) (quoting *Graham v. Connor*, 490 U.S.

386, 388 (1989)). In applying this standard, courts are to consider three factors in

assessing whether the conduct exhibited constituted excessive force. *See id.* "First,

[courts] look to the severity of the crime at issue; second, [courts] examine the extent to

which the suspect poses an immediate threat to the safety of the officers or others; and third, [courts] consider whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks omitted) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)); *see also Graham*, 490 U.S. at 396. "To properly consider the reasonableness of the force employed [the court] must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Armstrong*, 810 F.3d at 899 (internal quotation marks omitted) (quoting *Smith*, 781 F.3d at 101).

Moreover, the Fourth Circuit has instructed that, in addition to the *Graham* factors, the severity of the injuries is also a factor to be considered in determining whether the force employed was excessive. *Jones v. Buchanan*, 325 F.3d 520, 527, 530–31 (4th Cir. 2003). Importantly, the Fourth Circuit has continually held that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Meyers*, 713 F.3d at 733 (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)).

In June of this year, the Fourth Circuit addressed the second prong of the qualified immunity test as applied to similar excessive force claims in *Estate of Jones v. City of Martinsburg*, 961 F.3d 661 (4th Cir. 2020). The Fourth Circuit reiterated that this Court must "define the [aggrieved] right at the 'appropriate level of specificity.'" *Jones*, 961 F.3d at 667 (quoting *Booker*, 855 F.3d at 539). And "[in] the context of an ongoing police encounter," the Court must "focus on the moment that the force is employed." *Id.* at 668 (citation omitted).

27

Notably, in *Jones*, the district court found in favor of the defendant-officers at the summary judgment stage; yet, the Fourth Circuit found that summary judgment was inappropriate in that case, as "it was clearly established that officers may not shoot a secured or incapacitated person," and thus the officers were not entitled to qualified immunity. *Id.* at 668, 673. The court stated that "in 2013, it was already clearly established that suspects can be secured *without* handcuffs when they are pinned to the ground, and that such suspects *cannot* be subjected to further force." *Id.* at 668 (emphasis added). Moreover, *Jones* recognized that "it was clearly established in 2013 that officers may not use force against an incapacitated suspect." *Id.* at 669.

The Fourth Circuit has repeatedly emphasized that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Meyers*, 713 F.3d at 734 (quoting *Bailey*, 349 F.3d at 744–45). The Court is mindful that, in applying the pertinent Fourth Circuit law, it remains bound by the facts as alleged in the Complaint, as this matter appears before the Court merely at the motions to dismiss stage.

Plaintiff contends that the overall seizure of Lawhon was undertaken through unreasonable and excessive force. While the Court finds that Defendants did not violate a clearly established right by initially restraining Lawhon and attempting to take him into custody, Defendants continued use of force—spanning nearly six minutes—is questionable, and this Court is unable to determine—at this stage—the reasonableness of Defendants' conduct after they secured Lawhon in handcuffs.

28

Applying the *Graham* analysis, the first factor weighs in Plaintiff's favor—

Lawhon had not engaged in any crime at the time force was applied, and as the Court

previously determined, Lawhon was suffering from a mental illness that posed a serious

risk to his safety. In *Armstrong*, the Fourth Circuit determined that, where an individual

committed no crime, and the officers had reason to believe the individual was mentally ill

and presented a danger to himself, the "first *Graham* factor . . . weighs against imposition

of force. The government's interest in seizing [the individual] was to prevent a mentally

ill man from harming himself. The justification for the seizure, therefore, does not

vindicate any degree of force that risks substantial harm to the subject." *See* 810 F.3d at

899–901. Accordingly, based on the record presently before the Court, the first *Graham*

factor must weigh in Plaintiff's favor.

However, as similarly found by the Fourth Circuit in *Armstrong*, the second and

third *Graham* factors weigh in Defendants' favor and justify some use of limited force.

*See id.* at 901 ("Noncompliance with lawful orders justifies some use of force, but the

level of justified force varies based on the risks posed by the resistance."); *see also*

*Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily

carries with it the right to use some degree of physical coercion or threat thereof to effect

it."). *Contra Armstrong*, 810 F.3d at 904 ("Even noncompliance with police directives

and nonviolent physical resistance do not necessarily create 'a continuing threat to the

officers' safety.'" (quoting *Meyers*, 713 F.3d at 733)). Considering Tunstall's response to

Defendants potentially leaving Lawhon in her home and her obvious fear of what he may

29

do to himself, coupled with Lawhon's adamant refusal to be taken into custody and his clear resistance to the Defendants' attempts to secure him in handcuffs, it was objectively reasonable for Defendants to apply some force to detain Lawhon.[14]

Importantly, courts have found that being placed in the prone position, alone, does not constitute deadly force. *See, e.g., Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593–94 (7th Cir. 1997) ("For a particular application of force to be classified as 'deadly,' it must at least 'carry with it a substantial risk of causing death or serious bodily harm.' . . . Under this standard, restraining a person in a prone position, with constant monitoring, cannot be characterized, in itself, as 'deadly' force." (quoting *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988))). Furthermore, the Fourth Circuit in *Armstrong* recognized that "[a]pplying 'just enough weight' to immobilize an individual 'continuing to struggle' during handcuffing is not excessive force." 810 F.3d at 906 n.11 (quoting *Estate of Phillips*, 123 F.3d at 593). Accordingly, the Court finds that the force employed by the Defendants to seize and secure Lawhon in handcuffs was reasonable—at least initially.

However, the Court must "consider the reasonableness of the force employed . . . in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Id.* at 899 (quoting *Smith*, 781 F.3d at 101). At this stage, the Court cannot determine whether Defendants' continued use of force—holding Lawhon down in

---

[14] Plaintiff conceded at the hearing on the Motions to Dismiss that, if probable cause existed to seize Lawhon, some degree of force was justified to detain him.

the prone position for over five minutes, with allegedly all of the Defendants "persist[ing]

in holding Mr. Lawhon in the prone position . . . ," even after he exclaimed "I can't

breathe"—was justified. (*See* Compl. ¶ 29.) Despite Defendants' assertions that Lawhon

was resisting arrest—thrashing, screaming, and even spitting—taking the facts as alleged

in Plaintiff's Complaint as true, Lawhon was sufficiently secured after being restrained in

handcuffs, and the Defendants' continued application of force, while maintaining him in

the prone position, allegedly caused his death. These allegations not only form a

sufficient claim for excessive force, but it was clearly established in January 2018 that

Defendants' alleged conduct constituted a Fourth Amendment violation.[15] *See Jones*,

961 F.3d at 668, 671; *Meyers*, 713 F.3d at 734; *Young v. Prince George's County*, 355

---

[15] This decision is amplified by Plaintiff's allegations that
> [A]t least as early as 2010, RCPD began training its officers to avoid certain conditions and circumstances associated with sudden death in custody due to positional asphyxia. It also implemented General Order 6-10, which provided the following guidance and directives on the subject: . . . 'To minimize the potential for in-custody injury or death, officers shall: . . . Get the subject off his/her stomach as soon after handcuffing as circumstances allow . . . .'

(Compl. ¶ 13 (quoting RCPD Gen. Order 6-10(V)(I), Compl. Ex. B, at 9).) Plaintiff also specifically alleges that the Defendant-officers had been trained in accordance with General Order 6-10. (*Id.* ¶ 14.)

Importantly, the Fourth Circuit has utilized training and guideline manuals as evidence to support a Plaintiff's case for excessive force. *See Armstrong*, 810 F.3d at 902 ("The taser use at issue in this case . . . contravenes current industry and manufacturer recommendations."); *Thomas v. Holly*, 533 F. App'x 208, 218–19 (4th Cir. 2013) (unpublished); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("[T]he Officers' training outlined the boundaries of excessive force and made clear that lying on a suspect can cause asphyxiation. All three Officers admitted that they were aware of the potential danger of putting pressure on an individual's back or diaphragm."). While the Defendant-officers contend that the standard of removing individuals from the prone position is amorphous, the Court cannot determine at this juncture if Defendants reasonably followed that standard by keeping Lawhon in the prone position for over five minutes.

F.3d 751, 753 (4th Cir. 2004) (finding that it could not conclude that the force employed

by the officer after the plaintiff was handcuffed—including striking the back of the

plaintiff's head and pounding his knee into his back—was reasonable); *Bailey*, 349 F.3d

at 745 ("It was especially clear that [the officers] were not entitled to use force after [the

seized individual] was secured face down on the floor in handcuffs and leg restraints.");

*see also Abdullahi v. City of Madison*, 423 F.3d 763, 769–70 (7th Cir. 2005) ("No one

contends that deadly force was justified once [the decedent] was lying prone on the

ground with his arms behind him . . . , and yet the record supports an inference that [the

officer] knelt on [the decedent] with enough force to inflict lethal injuries. Accordingly,

it is for a jury, and not for [the court], to weigh all the evidence and choose between

competing inferences."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th

Cir. 2004) ("Creating asphyxiating conditions by putting substantial or significant

pressure, such as body weight, on the back of an incapacitated and bound suspect

constitutes objectively unreasonable excessive force.").

     The Court would be remiss if it did not identify key factual distinctions between

this case and *Armstrong* and *Jones*. In both of those cases before the Fourth Circuit, a

much greater degree of force was employed. *See Jones*, 961 F.3d at 663–64 ("Armed

only with a knife tucked into his sleeve, [the decedent] was tased four times, hit in the

brachial plexus, kicked, and placed in a choke hold. In his final moments, he lay on the

ground between a stone wall and a wall of five police officers, who collectively fired 22

bullets."); *Armstrong*, 810 F.3d at 902 ("Deploying a taser is a serious use of force.").

Furthermore, the defendants in those cases apparently failed to participate in lengthy counseling or discussion with the decedent before engaging in substantial, and deadly, force. *See Jones*, 961 F.3d at 664–65; *Armstrong*, 810 F.3d at 896–97.

Conversely, in this case, Defendant Edwards attempted to de-escalate the situation and counseled Lawhon for 20 minutes, and extensively attempted to convince Lawhon to go to the hospital voluntarily—continually reassuring him that the Defendants were not there to harm or arrest him. Furthermore, no weapons were employed, and some of the Defendants appear to have applied minimal pressure in holding Lawhon down, as shown in the accompanying video attachment. Defendants also contend that they continued to hold Lawhon down because he was resisting Defendants' attempts to take him into custody, and the video substantiates that Lawhon was actively resisting detention after he was secured in handcuffs—at least initially. Defendants further maintained at the hearing that the level of force employed was essential to subdue Lawhon and combat his resistance.[16] Moreover, Defendants constantly monitored Lawhon while they maintained him in the prone position—asking him if he was okay and inquiring about his ability to breathe. Finally, in the absence of any toxicology or autopsy report, the Court is unable to determine whether Defendants' use of force actually caused Lawhon's death, as he had

---

[16] The Defendant-officers specifically argued at the hearing that Defendants only used their hands to subdue Lawhon. However, that assertion is contrary to the facts alleged in the pleadings and exhibited in the video evidence, which establish that at least three of the Defendants held Lawhon down with their knees. (Compl. ¶ 28; Tenley's Mem. Supp. Mot. Dismiss at 6, ECF No. 17; Mayes's Mem. Supp. Mot. Dismiss at 11, ECF No. 19.)

purposefully ingested a substantial amount of drugs and sustained significant injuries to his face prior to the Defendants' arrival. However, at this stage, the record remains inadequate to determine whether the totality of force used over several minutes was reasonable and proportionate.

Accordingly, the Court finds that the force employed by Defendants to initially seize and restrain Lawhon—up to the point of placing Lawhon in handcuffs—was not excessive. Therefore, to the extent Plaintiff claims these actions violated Lawhon's Fourth Amendment right, those allegations will be dismissed. However, without a more fulsome record, the Court must deny the portions of Defendants' Motions to Dismiss as to Plaintiff's Fourth Amendment excessive force claim relating to the force employed after Lawhon was successfully secured in handcuffs.[17]

### C. The Court will grant in part and deny in part Defendants' Motions to Dismiss as to Plaintiff's state law claims for false arrest and battery.

Finally, in addition to her constitutional claims, Plaintiff brings four state causes of action against Defendants—two for false arrest and two for battery, alleging both survival and wrongful death claims for each. As an initial matter, Defendants Tenley and Mayes contend that both of the survival claims should be dismissed because, pursuant to

---

[17] However, this Court's determination at this point does not preclude Defendants from raising the defense of qualified immunity again after the development of a more extensive record. *See Sisson v. Piedmont Reg'l Jail Auth.*, No. 3:19-CV-602–HEH, 2020 WL 1307858, at *8 n.4 (E.D. Va. Mar. 19, 2020); *Deavers v. Spotsylvania Cty. Sheriff's Dep't*, 3:14CV365–HEH, 2014 WL 2993445, at *4 (E.D. Va. July 2, 2014) ("As the Fourth Circuit has frequently noted, qualified immunity is peculiarly well-suited for resolution at the summary judgment stage with the benefit of a more fulsome record.").

34

Virginia law, if a tort victim dies of his injuries sustained by the alleged tort, then the proper cause of action is a wrongful death claim, rather than a survival claim. *See Hendrix v. Daugherty*, 457 S.E.2d 71, 75 (Va. 1995) ("[A] person may not recover for the same injury under the survival statute and the wrongful death statute. There can be but one recovery."). However, while a plaintiff may not recover under both causes of action for the same injury, "the election [between remedies] is required only at a time when the record sufficiently establishes that the personal injuries and the death arose from the same cause." *Centra Health, Inc. v. Mullins*, 670 S.E.2d 708, 718 (Va. 2009).

Even though the allegations supporting Plaintiff's survival and wrongful death claims mirror each other, thus giving rise to the assumption that Plaintiff is asserting that Lawhon died of his injuries, the parties have failed to provide the Court with a copy of the autopsy report. Thus, at this stage, the record does not sufficiently establish that Lawhon's personal injuries and death arose from Defendants' conduct. *See id.* Accordingly, the Court finds it inappropriate to dismiss the survival claims, in lieu of the wrongful death claims, at this time.

However, neither claim for false arrest, under either theory of survival or wrongful death, can survive. In Virginia, false arrest is synonymous with false imprisonment. *Eaton v. Paramount Parks, Inc.*, 141 F.3d 1158 (4th Cir. 1998) (unpublished table decision). "False imprisonment is the restraint of one's liberty without any sufficient legal excuse." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011); *see also Raub*, 2014 WL 130974, at *3. Thus, "[i]f the plaintiff's arrest was lawful, the plaintiff cannot prevail on

35

a claim of false imprisonment." *Lewis*, 708 S.E.2d at 890.

For the reasons articulated above, and pursuant to Virginia's emergency custody statute, Defendants had probable cause to seize Lawhon, or at least acted reasonably and seized him in good faith. *See id.*; *see DeChene v. Smallwood*, 311 S.E.2d 749, 751 (Va. 1984) ("[T]he conduct of [the plaintiff] which prompted his arrest occurred in [the officer's] presence; therefore, the legality of the arrest will turn on whether [the officer] acted in good faith and with reasonable belief in the validity of the arrest."). *See generally Douglass v. Sanok*, No. 3:05cv18, 2006 WL 2927780 (W.D. Va. Oct. 11, 2006). Furthermore, the Fourth Circuit has held that when the officials "actions were, as a matter of law, reasonable in the circumstances of [the] case, they cannot be negligent or wrongful . . . . [and thus,] the plaintiffs have no state law claim." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998); *see also Bethea v. Howser*, __ F. Supp. 3d __, 2020 WL 1326830, at *15 (E.D. Va. Mar. 20, 2020); *Russell v. Wright*, 916 F. Supp. 2d 629, 645 (W.D. Va. 2013); *Thompson v. City of Danville*, No. 4:10CV12, 2011 WL 2174536, at *9 (W.D. Va. June 3, 2011). Accordingly, under either theory of survival or wrongful death, Plaintiff's false arrest claims against Defendants fail and must be dismissed.

Similarly, to the extent Plaintiff asserts battery claims against Defendants for the *initial* seizure and restraint of Lawhon, those claims also must fail. "Virginia defines a battery as 'an unwanted touching which is neither consented to, excused, nor justified' . . . . A legal justification for the act being complained of will defeat an assault or battery

36

claim." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (*quoting Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003)). "Importantly, Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties." *Id.* Again, the record at this stage supports the finding that Defendants were legally justified in their initial contact with Lawhon in order to take him into custody.

However, with respect to the alleged battery claims, Plaintiff also asserts that "the application of force employed by Defendants set forth in [the Complaint] was unconstitutionally excessive." (Compl. ¶¶ 74, 80.) As with the excessive force claims pursuant to § 1983, this Court is unable to determine at this juncture whether the totality of force used, after Lawhon was secured in handcuffs, was justified, or instead constituted an unwarranted touching. Accordingly, these aspects of her battery claims survive under Rule 12(b)(6).

Defendants also maintain they are immune from Plaintiff's state law claims.[18]  The

---

[18] Notably, Defendants Edwards, Turner, and Mayes assert qualified immunity as to Plaintiff's state causes of action—as they did with Plaintiff's federal claims. However, Virginia recognizes its own immunity—sovereign immunity—for its state law claims, rather than the federal doctrine of qualified immunity. *See Cilman v. Reeves*, 452 F. App'x 263, 268 n.4 (4th Cir. 2011) (unpublished) (citing *Burnham v. West*, 681 F. Supp. 1169, 1171 (E.D. Va. 1988)); *Viers v. Baker*, 841 S.E.2d 857, 861 n.3 (Va. 2020); *Cromartie v. Billings*, 837 S.E.2d 247, 254 (Va. 2020). Only Defendants Tenley and Mayes have raised this defense as to Plaintiff's state law claims. However, at this juncture, none of the Defendants are shielded by Virginia's sovereign immunity defense.

"In Virginia, sovereign immunity protects employees of a local government if: (1) the employing entity has immunity for the function performed by the employees; (2) the employees meet [a] four-factor test . . . ; and (3) the claim against the employee raises liability based on simple negligence." *Octave v. Wade*, No. 3:16-cv-338–JAG, 2017 WL 465467, at *2 (E.D. Va. Feb. 3, 2017). While the Court may need to determine at some point whether the first two elements of this test are satisfied as to all of the Defendants, it is clear that, at this stage, the

Defendant-officers, through their reply, assert they are entitled to Virginia's good faith

immunity defense, as articulated in *DeChene*, 311 S.E.2d at 751. *See Epperson v. Smith*,

No. 4:16-cv-50, 2018 WL 2470735, at *10 (W.D. Va. May 31, 2018) ("*DeChene* stands

for the proposition that an officer is entitled to qualified immunity under Virginia law

when he shows that (i) he believed in good faith that his actions were lawful, and (ii) that

his belief was reasonable."); *see also Harrison v. Deane*, 426 F. App'x 175, 181 (4th Cir.

2011) (unpublished). For the reasons articulated in this Opinion's excessive force

analysis, Plaintiff has stated sufficient facts to place at issue whether the Defendant-

officers had a good faith belief that their employment of additional force after Lawhon

was handcuffed was lawful, or that such belief was reasonable under the circumstances.

(Compl. ¶ 31 ("[N]either Officer Edwards nor Officer Turner heeded their training or

General Order 6-10 and repositioned Mr. Lawhon so he could breathe. Rather, with a

gall that is beyond the pale, Officer Edwards opted to taunt Mr. Lawhon, stating 'I'm

225lbs of pure come get you some.'"), ¶ 42 ("[T]he use of force at issue was motivated

by a punitive intent rather than legitimate safety concerns or law enforcement

---

Defendants are not protected by sovereign immunity because Plaintiff's claims against
Defendants are not for mere negligence. "Regardless of whether they work for cities, counties,
towns, or other entities, individual employees have immunity only from simple negligence
claims. They do not have immunity from intentional torts, or torts involving gross negligence or
willful and wanton negligence." *Dowdy v. Pamunkey Reg'l Jail Auth.*, No. 3:14-cv-003–JAG,
2014 WL 2002227, at *4–5 (E.D. Va. May 15, 2014); *see Tomlin v. McKenzie*, 468 S.E.2d 882,
884 (Va. 1996) ("[W]here sovereign immunity is claimed by an agent of the state, rather than by
the state as an entity, it will not be extended to acts which constitute a wanton and intentional
deviation from the duties the agent has been assigned to undertake."). Because Plaintiff's battery
claims are intentional torts—for Defendants' alleged use of intentional and excessive force—
Defendants are not entitled to immunity for these claims at this juncture.

concerns.").) Accordingly, at this stage, this defense must fail as to Plaintiff's remaining state law battery claims.

Similarly, the Defendant-EMTs assert a different, but related, form of good faith immunity, pursuant to Virginia's "Good Samaritan" statute. *See* Va. Code Ann. § 8.01-225(A)(5) ("Any person who . . . [i]s an emergency medical services provider possessing a valid certificate issued by authority of the State Board of health who in good faith renders emergency care or assistance . . . without compensation, to any injured or ill person, . . . shall not be liable for any civil damages for acts or omissions resulting from the rendering of such emergency care, treatment, or assistance . . . ."). This statute only shields those who "in good faith render[] emergency care or assistance." *See id.* However, Plaintiff specifically alleges that Defendants, including the Defendant-EMTs, *failed* to render medical aid to Lawhon, and instead "persisted in holding Mr. Lawhon in the prone position with his face being pressed into the pillow." Compl. ¶ 29; *see* Compl. ¶ 37 ("Even though motionless, unresponsive, and clearly in desperate need of medical attention, not one of the Defendants rendered medical aid to Mr. Lawhon for an additional ninety-three seconds."); *see also Harrison v. Prince William Cty. Police Dep't*, 640 F. Supp. 2d 688, 713 (E.D. Va. 2009). Thus, at this stage, this defense would also fail to immunize the Defendant-EMTs from Plaintiff's battery claims as they pertain to excessive and unwarranted force after Lawhon was secured in handcuffs.[19]

---

[19] All of the Defendants are free to raise Virginia's immunity defenses as to Plaintiff's remaining state law claims again following discovery.

## III.   CONCLUSION

This matter is not before the Court on a motion for judgment as a matter of law or summary judgment; instead, Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6). As mentioned at the beginning of this Memorandum Opinion, at this stage, this Court is both informed and constrained by the facts as alleged in the Complaint. While the facts make eminently clear that Defendants had probable cause to seize Lawhon, and are immune from any resulting claim, as well as any claim pertaining to the force used to initially restrain him, the Court cannot determine at this point whether Defendants used unreasonable and excessive force after Lawhon was initially secured in handcuffs. Accordingly, this Court must grant in part and deny in part Defendants' Motions to Dismiss.

An appropriate Order will accompany this Memorandum Opinion.

/s/
_____
Henry E. Hudson
Senior United States District Judge

Date: **August 10, 2020**
Richmond, VA

40